IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| PILEPRO, LLC, PILEPRO SALES CORPORATION, BLUE EMERALD, INC. f/k/a/ PILEPRO, INC, PILEPRO STEEL, LP, and ROBERTO R. WENDT, | § § § § § | |
| Plaintiffs, | § § | CASE NO. 12:cv-00829 SS |
| v. | § § | JURY DEMAND |
| HUMPHREY CHANG, RICHARD HEINDL, MATTHIAS WEIGEL, and STEELWALL, GMBH, | § § § § | |
| Defendants. | § § | |

## CORRECTED COMPLAINT[1]

PilePro, LLC; PilePro Sales Corporation; Blue Emerald, Inc., f/k/a PilePro Inc.; PilePro Steel, LP; and Roberto R. Wendt allege as follows:

### PRELIMINARY STATEMENT

1.      This action arises from the conduct of a criminal enterprise operated by Defendants Humphrey Chang; Richard Heindl; Matthias Weigel; and Steelwall, GmbH, (collectively the "Defendants" or "RICO Defendants") together with other individuals and entities with whom they conspired, and who aided and abetted them.  Through a series of interrelated fraudulent schemes, Defendants, and those with whom they conspired, defrauded and divested the Plaintiffs of valuable patent rights and substantial amounts of money.

2.      Plaintiffs are industry leading manufacturers of specialized connectors that join steel sheet piling together for use in large construction projects in the United States and around

---

[1] After filing, Plaintiffs became aware of a small number of clerical errors in their Complaint.  Plaintiffs file this Corrected Complaint merely to correct those errors.  Plaintiffs have not added, deleted or modified any causes of action.

**CORRECTED COMPLAINT**

the world.  In the span of a few short, chaotic years, Plaintiffs built a global business worth tens or hundreds of millions of dollars.  The Plaintiffs protect their business through a number of highly valuable patents that give them a technological advantage in the marketplace and prevent competitors from copying their connector designs.

3.     In the midst of Plaintiffs' rapid expansion and under the guise of a plan to reorganize the Plaintiffs' group of companies, Defendants Humphrey Chang and Richard Heindl, two former employees, and Defendant Matthias Weigel, PilePro, LLC's former patent attorney, fraudulently transferred patents worth tens or hundreds of millions of dollars belonging to PilePro, LLC and significant sums of money belonging to PilePro, LLC and PilePro Sales Corporation to Contexo, AG, a Swiss corporation currently controlled by Richard Heindl.  At the same time, Chang and Heindl also engaged in false financial reporting to Plaintiffs, enabling them to divert unlawfully large amount of money belonging to Plaintiffs.

4.     The Defendants have used the patent rights and cash fraudulently obtained from the Plaintiffs to create and operate Defendant Steelwall, GmbH, through which the Defendants, and those with whom they conspired, now compete against the Plaintiffs in the United States, Europe, and other parts of the world.

5.     The Defendants' conduct violates the Federal Racketeering Influenced and Corrupt Organizations Act ("RICO"), through predicate acts of wire fraud, money laundering, the interstate transportation of individuals, and other criminal acts.  In addition, the Defendants' acts constitute common law fraud, conspiracy, breach of fiduciary duty, breach of contract, intentional interference with contractual relations, intentional interference with prospective economic advantage, and other common law torts.

2

**CORRECTED COMPLAINT**

## PLAINTIFFS, RICO DEFENDANTS,
## AND RELEVANT RICO CO-CONSPIRATORS

**Plaintiffs:**

6.      PilePro, LLC ("PilePro LLC") is a Delaware limited liability company with its principal place of business in Austin, Texas.  PilePro is, therefore, a citizen of Delaware and Texas.  PilePro LLC heads the PilePro group of companies.  It is currently a holding company that owns valuable domestic and foreign patents, which it licenses to its affiliated entities.

7.      PilePro Sales Corporation ("PilePro Sales") is a Nevada corporation with its principal place of business in Austin, Texas.  PilePro Sales is, therefore, a citizen of Nevada and Texas.  PilePro Sales is an affiliate of PilePro LLC and is part of the PilePro group of companies.  PilePro Sales was formed to be the operational arm for the PilePro group of companies.  For a period of time, it licensed patents for specialized connectors for steel sheet piling from PilePro LLC and then manufactured, marketed, and sold those connectors domestically and internationally.

8.      Blue Emerald, Inc. formerly known as PilePro, Inc. ("PilePro Inc") is a Delaware corporation with its principal place of business in Austin, Texas.  PilePro Inc is, therefore, a citizen of Delaware and Texas.  For a period of time relevant to this Complaint, PilePro Inc was the managing member of PilePro LLC.

9.      PilePro Steel, LP ("PilePro Steel") is a Texas limited partnership with its principal place of business in Austin, Texas.  PilePro Steel is, therefore, a citizen of Texas.  PilePro Steel is a successor-in-interest to certain rights previously owned by PilePro Sales.  For purposes of this Complaint, PilePro Sales and PilePro Steel are used interchangeably.

3

**CORRECTED COMPLAINT**

10.     Roberto R. Wendt ("Wendt") is an individual who is an alien admitted to the United States for permanent residence.  He resides in Austin, Texas.  Wendt is, therefore, deemed to be a citizen of Texas.  Wendt is the Managing Member of PilePro LLC, the President of PilePro Sales, the President of PilePro Inc, and the Manager of the general partner of PilePro Steel.

11.     PilePro LLC, PilePro Sales, PilePro Inc., PilePro Steel, and Wendt are sometimes collectively referred to as the "PilePro Plaintiffs."

**RICO Defendants:**

12.     The Defendants identified in Paragraphs 13 through 16 of this Complaint are individuals and entities who have engaged in, and conspired to engage in, a pattern of racketeering activity in connection with a criminal enterprise.  Each has committed numerous predicate acts as part of the racketeering activity and each has participated in the operation or management of the criminal enterprise.  This Complaint shall sometimes refer to these Defendants collectively as the "RICO Defendants."

13.     Humphrey Chang ("Chang") is an individual who currently resides in the State of California.  Chang is, therefore, a citizen of California.  He is the former Chief Financial Officer of PilePro LLC and PilePro Sales.  Exercising personal jurisdiction over Chang in this District is reasonable and proper for the reasons set forth in Paragraph 26 of this Complaint.

14.     Richard Heindl ("Heindl") is an individual who currently resides in Germany.  Heindl is, therefore, a citizen of Germany.  He is the former Vice-President, Director of Global Engineering & Technology Development of PilePro Sales.  He is also the former managing director of Wall-Profile, GmbH.  Exercising personal jurisdiction over Heindl in this District is reasonable and proper for the reasons set forth in Paragraph 27 of this Complaint.

4

**CORRECTED COMPLAINT**

15.     Matthias Weigel ("Weigel") is an individual and attorney who currently resides in Germany.   Weigel is, therefore, a citizen of Germany.   Weigel was formerly PilePro LLC's primary patent attorney, with responsibility for PilePro LLC's patents in the United States, Germany, and worldwide.   Exercising personal jurisdiction over Weigel in this District is reasonable and proper for the reasons set forth in Paragraph 28 of this Complaint.

16.     Steelwall, GmbH ("Steelwall GmbH") is a German corporation with its principal place of business currently in Munich, Germany.   Steelwall GmbH also maintains employees in, and does business from, the State of California.   Steelwall is, therefore, a citizen of California and Germany.   Exercising personal jurisdiction over Steelwall GmbH in this District is reasonable and proper for the reasons set forth in Paragraph 29 of this Complaint.

**Non-Party Co-Conspirators:**

17.     Other non-party individuals and entities played roles, direct or indirect, in the RICO Defendants' racketeering activity and fraudulent schemes.   This Complaint shall sometimes collectively refer to these individuals and entities as the "RICO Co-Conspirators." Foremost among RICO Co-Conspirators are the following:

18.     Contexo, AG ("Contexo") is a Swiss corporation with its principal place of business in Switzerland.   Contexo is, therefore, a citizen of Switzerland.

19.     Enrico O. Farroni ("Farroni") is an individual and attorney who resides in Switzerland.   Farroni is, therefore, a citizen of Switzerland.   Farroni was retained by PilePro LLC to provide legal and trustee services in connection with Contexo.   Farroni intentionally and fraudulently repudiated his trust agreement and duties.   As more fully described below, Farroni participated in, aided, and abetted, the RICO Defendants' racketeering activity and fraudulent schemes.

5

**CORRECTED COMPLAINT**

20.     Roland Harzenmoser ("Harzenmoser") is an individual who resides in Switzerland.  Harzenmoser is, therefore, a citizen of Switzerland.  Harzenmoser was retained by PilePro LLC to provide trustee services in connection with Contexo.  Harzenmoser intentionally and fraudulently repudiated his trust agreement and duties.  As more fully described below, Harzenmoser participated in, aided, and abetted, the RICO Defendants' racketeering activity and fraudulent schemes.

21.     Steelwall Holding, AG ("Steelwall Holding") is a Swiss corporation with its principal place of business currently located in Switzerland.  Steelwall Holding is, therefore, a citizen of Switzerland.  Heindl, Farroni and Harzenmoser are identified as directors of Steelwall Holding.  Steelwall Holding is registered to the same address used by Farroni.  Steelwall Holding was formed by Chang, Heindl, Farroni, and Harzenmoser for the purpose of participating in, aiding, and abetting, the RICO Defendants' racketeering activity and fraudulent schemes.

22.     Monique Doering ("Doering") is an individual who resides in Germany.  Doering is, therefore, a citizen of Germany.  Doering was Heindl's personal assistant during the time he was employed by Wall-Profile.   Doering participated in, aided, and abetted the RICO Defendants' racketeering activity and fraudulent schemes.

23.     Eastlink Capital Management, LLC ("Eastlink Capital") is a Nevada corporation with its principal place of business located in California.  Eastlink Capital is, therefore, a citizen of Nevada and California.  Eastlink Capital is wholly owned and controlled by Chang.  Eastlink participated in, aided, and abetted the RICO Defendants' racketeering activity and fraudulent schemes.

**CORRECTED COMPLAINT**

## SUBJECT MATTER JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over the Plaintiffs' claims for the following reasons:

        a.     The Court has subject matter jurisdiction over the PilePro Plaintiffs' claims set forth in the First and Second Counts under 28 U.S.C. § 1331, relating to federal question jurisdiction, and also under 18 U.S.C. § 1964(a) and (c), relating to civil RICO jurisdiction, because those claims arise under the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*

        b.     The Court has subject matter jurisdiction over the PilePro Plaintiffs' claims, including their state law claims, under 28 U.S.C. § 1332, relating to diversity jurisdiction. Complete diversity of citizenship between the Plaintiffs and Defendants exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

        c.     The Court also has subject matter jurisdiction over the PilePro Plaintiffs' state law claims under 28 U.S.C. § 1367, relating to supplemental jurisdiction.  The PilePro Plaintiffs' state law claims arise out of the same case or controversy as the claims stated in the First and Second Counts.  All claims in this action arise out of a common nucleus of operative facts.

25.     Venue is proper in this District for four reasons.  First, venue is proper under 28 U.S.C. § 1391(b) because a substantial number of events giving rise to this action occurred in this District.  Second, venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the property that is the subject of this Complaint is situated in this District.  Third, venue is proper under 18 U.S.C. § 1391(d) because the alien Defendants may be sued in this district.  Fourth, venue is proper under 18 U.S.C. § 1965(a), (b), and (d) because this Court has jurisdiction over

**CORRECTED COMPLAINT**

the subject matter of this civil RICO proceeding, one or more of the RICO Defendants are subject to personal jurisdiction within this District, and the ends of justice require all parties to be summoned in this District.

## PERSONAL JURISDICTION OVER RICO DEFENDANTS

26.     It is reasonable and proper for this Court to exercise personal jurisdiction over Chang for, at least, the following reasons:

a.      On September 8, 2011, the 200th Judicial District Court, Travis County, Texas entered a Temporary Injunction against Chang in connection with Chang's misappropriation of confidential information belonging to PilePro LLC and PilePro Sales.  Furthermore, in December 2011, the Travis County Court specifically found that Chang was subject to personal jurisdiction in the State of Texas because he personally availed himself of benefits afforded to residents of Texas.

b.      Chang was the Chief Financial Officer ("CFO") for PilePro LLC from October 2006 until his termination in April 2011.  He was also the CFO for PilePro Sales from its formation in January 2007 until his termination in April 2011.  In his capacities as CFO of the two companies, Chang regularly worked in the offices of PilePro LLC and PilePro Sales, both of which are located in Austin, Texas.  In addition, Chang also regularly transacted business on behalf of PilePro LLC and PilePro Sales by directing email and correspondence into and out from the State of Texas.

c.      Chang lived in an Austin, Texas residence while in Austin, Texas performing services for PilePro LLC and PilePro Sales.  Chang represented to the Internal Revenue Service that he resided at the Austin, Texas residence.

8

**CORRECTED COMPLAINT**

d.      Even when not physically located in Austin, Texas, Chang acted in, and intentionally directed actions toward, Austin, Texas.  Among other things, he directed, or caused to be directed, a large number of email, telephone calls, and other forms of communication to Austin, Texas for the purpose of conducting business on behalf of, or performing services for, PilePro LLC, PilePro Sales, and other entities in the PilePro group of companies.  Moreover, Chang directed a large number of communications into and out of the State of Texas as part of planning, carrying out, and concealing the RICO Defendants' schemes to defraud the PilePro Plaintiffs.

27.     It is reasonable and proper for this Court to exercise personal jurisdiction over Heindl for, at least, the following reasons:

a.      Heindl physically resided and worked in and around Austin, Texas from approximately August 2009 through April 2010.  In connection with efforts to obtain a visa from the United States Citizenship and Immigration Services office in July 2009, Heindl represented that he planned to reside and work in Austin, Texas as an employee of PilePro Sales. Based on those representations concerning residency in Austin, Texas, the United States granted Heindl a visa.  In addition, Heindl also entered into a written employment contract with PilePro Sales in Austin, Texas on or about May 22, 2009 and effective as of June 1, 2009.  During this period of time, Heindl knowingly and intentionally planned, carried out, and orchestrated portions of the RICO Defendants' scheme to defraud the PilePro Plaintiffs while he was in Austin, Texas.

b.      While residing in Austin, Texas, Heindl purposefully availed himself of the benefits of the State of Texas.

9

**CORRECTED COMPLAINT**

c.      In April 2008, Heindl purchased stock in, and became an officer of, PilePro Sales, which has its company headquarters in Austin, Texas. Heindl provided services to, and for the benefit of, PilePro Sales while residing in Germany before relocating to the United States in August 2009.

d.      Even when not physically located in Austin, Texas, Heindl intentionally directed actions toward Austin, Texas. Among other things, he directed, or caused to be directed, a large number of email, telephone calls, and other forms of communication to Austin, Texas for the purpose of conducting business with, or on behalf of, PilePro Sales and other entities in the PilePro group of companies. Moreover, Heindl directed a large number of communications into and out of the State of Texas as part of planning, carrying out, and concealing the RICO Defendants' schemes to defraud the PilePro Plaintiffs.

28.    It is reasonable and proper for this Court to exercise personal jurisdiction over Weigel for, at least, the following reasons:

a.      Weigel was PilePro LLC's lead patent attorney and was responsible for PilePro LLC's patent global portfolio, including PilePro LLC's United States patents. In connection with his responsibilities for PilePro LLC's United States patents, Weigel performed work in connection with preparing patent applications, drafting claims and specifications, and monitoring the status of patents registered with the United States Patent and Trademark Office. Weigel also directed the activities of attorneys in the United States, including attorneys in the State of Texas, providing them with instructions relating to PilePro LLC's United States patent filings, registrations, and administration.

10

**CORRECTED COMPLAINT**

Weigel reviewed and approved billing statements from those attorneys and then forwarded them to PilePro LLC in Austin, Texas for payment.

b.      Weigel travelled to Austin and Houston, Texas between June 23, 2007 and June 28, 2007 for the specific purpose of working on matters relating to PilePro LLC and PilePro Sales.   While in Austin, Texas Weigel met with Wendt and other PilePro employees for the purpose of providing legal services to the PilePro group of companies. Additionally, Wendt and Weigel travelled from Austin, Texas to Houston, Texas to meet with and retain the law firm of Novak, Druce & Quigg ("Novak Druce"), a patent law firm Weigel had selected to be his liaison patent counsel for PilePro LLC in the United States.  Weigel directly supervised work performed by Novak, Druce & Quigg.

c.      Between February 14, 2010 and February 20, 2010, Weigel again travelled to Austin, Texas for the specific purpose of working on matters relating to PilePro LLC, PilePro Sales, and other companies in the PilePro group.  While in Austin, Texas, Weigel met with Wendt, Chang, and Heindl, among other individuals.  Weigel attended company meetings and provided legal services to PilePro LLC and PilePro Sales.  In addition to meetings that included Wendt, Weigel secretly met with Chang and Heindl to plan portions of the RICO Defendants' scheme to defraud the PilePro Plaintiffs.

d.      Weigel directed, or caused to be directed, a large number of email, telephone calls, and other forms of communication to Austin, Texas.   His email, telephone calls, and other forms of communication were specifically related to the work he was performing for PilePro LLC, including work relating to PilePro LLC's United States patents.  In addition to email, telephone, and other communications relating to work for PilePro LLC, Weigel also directed such communications to the United States for

11

**CORRECTED COMPLAINT**

the purpose of planning, carrying out, and concealing the RICO Defendants' schemes to defraud the PilePro Plaintiffs.

e.      In or about March or April 2011, Weigel again availed himself of the opportunity to transact business within the State of Texas by retaining Novak Druce to be his liaison patent counsel in the United States for patent work being performed for the benefit of Heindl, Steelwall, and other RICO Defendants and RICO Co-Conspirators.  On April 29, 2011, Novak Druce filed four patent applications, prepared at least in part by Weigel, on behalf of Richard Heindl with the United States Patent and Trademark Office.

f.      Weigel also routinely sent billing invoices to PilePro LLC in Austin, Texas and received payment for his legal services from PilePro LLC via wire transfers from PilePro LLC's United States bank accounts.

29.     It is reasonable and proper for this Court to exercise personal jurisdiction over Steelwall GmbH for, at least, the following reasons:

a.      Steelwall GmbH is conducting business in the United States and in the State of Texas.  For example, Steelwall products, including products that are the subject of this Complaint, are being offered for sale by JD Fields & Company, Inc., based in Houston, Texas.  In addition, Steelwall GmbH has repeatedly sent marketing material, solicitations, and other sales related information into the United States and the State of Texas via email and telephone communication.  In connection with its United States marketing and sales efforts, Steelwall GmbH refers to itself as "Steelwall US."

b.      Steelwall GmbH is also conducting business in the United States and in the State of Texas through Chang, who identifies himself as Steelwall GmbH's North American Sales and Marketing Director.

12

**CORRECTED COMPLAINT**

c.      Steelwall GmbH has imported, and continues to import, steel sheet pile connectors and sealants into the United States through East Link Capital.

30.     The Court also has personal jurisdiction over the RICO Defendants because each of them engaged in, and caused others to engage in, knowing, intentional, and willful tortious and illegal acts for the specific purpose of defrauding, harming, and adversely affecting the PilePro Plaintiffs.  The RICO Defendants, therefore, directed their wrongful and illegal actions toward the State of Texas where the PilePro Plaintiffs reside and operate their businesses.  By doing so, the RICO Defendants knew, and acted with the intention that, the PilePro Plaintiffs would bear the brunt of the resulting harm in Austin, Texas.

## FACTUAL BACKGROUND

31.     The PilePro Plaintiffs are the world's leading suppliers of innovative hot-rolled and extruded steel sheet pile connectors.  Many large construction projects in the United States and throughout the world use their connectors.

32.     Steel sheet piles are long structural steel plates that are driven deep into the soil then joined together using vertical interlocking connectors.  When interconnected, the sheet piles create a continuous wall that is earth tight and water resistant.  Steel sheet piling systems often function as both temporary and permanent retaining walls in very large construction projects such as deep-water ports or bridge construction.

33.     The PilePro Plaintiffs' products are used to connect steel sheet piles. Their proprietary and innovative connector designs give them a competitive advantage in both the domestic steel sheet pile connector market ("Domestic Connector Market") and the international steel sheet pile connector market ("International Connector Market").  The PilePro Plaintiffs' product offerings, coupled with the PilePro business model, generate lucrative financial returns.

13

**CORRECTED COMPLAINT**

The PilePro Plaintiffs protect their competitive advantage in the Connector Market through a series of valuable patents issued by the United States ("US Patent Rights"), as well as Germany and other countries ("Non-US Patent Rights").

34.     During 2010, more than 2.2 million metric tons of steel sheet piling were produced for construction projects worldwide.   The total value of the 2010 global steel sheet piling market was estimated to be more than $3.1 billion.   That market is anticipated to grow each year as governments and developers around the world invest in major infrastructure projects.   As the market for steel sheet piling grows, the market for connectors, such as those sold by the PilePro Plaintiffs, is also anticipated to grow and become substantially more profitable.

**A.     Georg Wall Invented Modular Steel Sheet Piling Connectors.**

35.     Traditionally, steel sheet piles were joined by welding thick steel plates together. However, welding steel sheet piles is an expensive, labor-intensive, and time consuming process. In addition, over time, stresses caused by the soil or water being retained weaken welded connections. Eventually, welded connections become the weakest link in the retaining wall system and become subject to failure.

36.     In response to these problems, a German named Georg Wall invented a series of interlocking devices during the 1990s to connect steel sheet pile without welding ("Modular Connectors").   Modular Connectors made it possible to design and build steel sheet piling retaining walls at a lower cost, with less labor, and with less maintenance.   In addition, because they were more flexible and adaptable than traditional welded connectors, Modular Connectors allowed engineers and contractors to deal with alignment deviations while still providing a

14

**CORRECTED COMPLAINT**

strong, reliable connection.  Modular Connectors also increased the strength of steel sheet piling wall systems and lengthened their lifespan.

37.     To protect his Modular Connector inventions, Wall obtained patents in Germany, the United States, and other countries.

38.     Wall produced, marketed, and sold Modular Connectors through his existing steel sheet pile business called I.S. Handels, GmbH ("ISH"), a German corporation operating in Munich, Germany.  Wall was the sole stockholder in ISH.

39.     ISH produced Modular Connectors under production agreements with various steel fabricators in Germany and other parts of Europe.  Along with Modular Connectors, ISH also sold a special sealant called WADIT®.  WADIT makes steel sheet pile wall systems highly leak resistant in water.  Through an exclusive agreement with the sealant's manufacturer, ISH owned the exclusive right to sell the sealant in connection with steel sheet pile applications.

40.     In addition to selling its products directly, ISH also sold Modular Connectors and WADIT through authorized distributors in other countries, including the United States.

41.     Over the years, ISH became a modestly successful small business.  In its most financially successful year, ISH had fifteen employees and USD $2.4 million in revenue.

**B.     Heindl Did Not Have Any Ownership Interest In ISH Or Wall's Intellectual Property.**

42.     Heindl is Wall's nephew.

43.     Heindl is not an engineer, nor does he have any engineering background.  Instead, Heindl was educated and trained as a bank employee.  After he finished school, Heindl worked for many years on commercial and leasing transactions for banks, leasing companies, and his own business ventures.

15

**CORRECTED COMPLAINT**

44.     Heindl did not invent, and was not a registered owner of, any patents or designs for Modular Connectors used by Wall and ISH in their business.  Heindl did not invent, and was not a registered owner of, any other intellectual property used by Wall and ISH in their business.

45.     Heindl joined ISH in 1994 when his "uncle Georg" hired him after a commercial leasing business Heindl operated suffered financial failure, leaving Heindl without employment.

46.     Even though Heindl had no technical or engineering background, Wall hired him to work at ISH and gave him a job title: "Director of Research, Development and Technical Standards."

47.     In reality, Heindl functioned as a salesman and financing liaison.  Wall was solely responsible for inventing and developing Modular Connectors and pioneering the use of WADIT in connection with the installation of steel sheet piling connectors.

48.     From 1994 through October 2003, Heindl helped ISH obtain financing for its production and distribution needs and helped ISH establish a distribution network with companies outside Germany.

49.     Heindl did not own any stock, or have any other expectation of ownership, in ISH.  Nonetheless, Heindl unabashedly referred to himself as "the heir to uncle George at IS Handels GmbH."  He has also often referred to Wall's Modular Connector Business as "his life's work."

**C.     PilePro LLC Became The Exclusive U.S. Distributor for ISH's Modular Steel Sheet Piling Connectors.**

50.     Wendt had experience buying and selling steel internationally.

51.     In 2002, Wendt met Heindl, who was in the United States as an employee of ISH looking for a company to distribute ISH's Modular Connectors and WADIT.   After becoming

16

**CORRECTED COMPLAINT**

familiar with Modular Connectors, Wendt recognized that Wall's patented designs were an undervalued, disruptive technology.  He believed that, properly marketed, Modular Connectors could become a very lucrative product in the growing steel sheet pile industry.  As a result, Wendt agreed to become ISH's exclusive distributor in the United States.

52.     On July 29, 2002, Wendt formed PilePro LLC for the specific purpose of marketing and selling ISH's Modular Connectors and WADIT in the United States.  Wendt was the sole member and only manager of the limited liability company.  Wendt owned one-hundred percent of the membership interests in PilePro LLC.

53.     Wendt thereafter began selling ISH's Modular Connectors and WADIT throughout the United States.  Among others projects, Wendt and PilePro LLC sold ISH's Modular Connectors for very difficult portions of the post-9/11 World Trade Center excavation and reconstruction project.

54.     During the course of their business relationship, Wendt and Heindl became friend.

**D.     Wall Sold The Connector Business Assets To PilePro LLC, Not Heindl.**

55.     By 2002, ISH's financial future became uncertain.  Wall suffered his second heart attack.  ISH's business had, as a consequence, begun declining.  Therefore, Wall decided to sell his business assets, including the registered patents, pending patent applications, trademarks, production rights, and other tangible and intangible assets relating to the steel sheet piling connector business he operated through ISH ("Connector Business Assets").

56.     In 2002, Heindl told Wendt that Wall wanted to sell the Connector Business Assets.

57.     After hearing about the opportunity, Wendt suggested that Heindl purchase the Connector Business Assets from "his uncle Georg" and continue "his life's work."  Wendt even

17

**CORRECTED COMPLAINT**

explained how Heindl could purchase the Connector Business Assets and also outlined a business model for operating a Modular Connector company going forward.

58.     Heindl declined and, instead, recommended that Wendt take advantage of the opportunity.

59.     After Heindl declined, Wendt assembled investors and began negotiations to purchase the Connector Business Assets.

60.     On October 27, 2003, PilePro LLC, having successfully raised equity and debt financing from outside investors, purchased all of the Connector Business Assets from Wall.  At the same time, PilePro LLC entered into a separate lifetime consulting contract and non-competition agreement with Wall to ensure that he was available exclusively to PilePro LLC to consult on new Modular Connector designs and needs for PilePro LLC's customers.  For a number of years after he entered into the consulting agreement, Wall continued providing Modular Connector design consulting services to PilePro LLC.

61.     Heindl did not provide any of the funds used to purchase the Connector Business Assets, either directly or indirectly.  Moreover, Heindl did not receive any proceeds from the purchase price paid to Wall, either directly or indirectly.

62.     Heindl was not an investor in PilePro LLC and owned no interest in PilePro LLC, either directly or indirectly.

63.     Wall did not sell the Connector Business Assets to Heindl, even though Heindl was Wall's nephew, even though Heindl had worked for ISH for approximately nine years, and even though Heindl professed himself to be the "heir to uncle George at IS Handels GmbH."

18

**CORRECTED COMPLAINT**

64.     In fact, by the end of 2002, Wall had reduced Heindl's compensation to approximately €2,500 per month.  At various times, Heindl even stated that Wall was threatening to fire him and cut him off.

**E.      Heindl Managed The Day-To-Day Business Of PilePro LLC's German Operations.**

65.     After purchasing the Connector Business Assets, PilePro LLC owned all patents and other intellectual property rights relating to Wall's and ISH's Modular Connectors, as well as ISH's exclusive agreement relating to WADIT.  It also assumed all of ISH's then-existing Modular Connector business operations and relationships.

66.     Because PilePro LLC, an American business, had purchased the operations and assets of a German business, Wendt decided to establish two centers of operation for PilePro LLC, one in the United States and the second in Germany.

67.     PilePro LLC functioned as the operational center in the United States and as the global headquarters of the PilePro group of companies.  PilePro LLC owned all patents and intellectual property used in the company's business and was primarily responsible for business in the United States and other, non-European, countries.

68.     Wendt assumed responsibility for, and control over, PilePro LLC's day to day operations.  Wendt also retained overall responsibility for, and ultimate control over, all of PilePro LLC's business worldwide, including the German operations.

69.     For its German operational center, PilePro LLC formed Wall-Profile, GmbH, a German company, ("Wall-Profile") on October 30, 2003.  Wall-Profile was a trademark used by ISH in connection with its Modular Connector business and was chosen as the name for PilePro LLC's German operations center in order to benefit from the associated goodwill.  Wall-Profile was formed as a wholly owned subsidiary of PilePro LLC and was assigned primary

19

**CORRECTED COMPLAINT**

responsibility for conducting PilePro LLC's business in Germany, Europe, and other countries near the region.

70.     Because Wendt resided in the United States, Wendt hired Heindl to be Wall-Profile's manager and delegated control over Wall-Profile's day-to-day business and financial operations to him.

71.     Wendt delegated significant responsibility for, and control over, Wall-Profile's business operations to Heindl for several reasons, including but not limited to:

    a.     Heindl persuaded Wendt that his nine years of experience at ISH made him the best person to manage Wall-Profile going forward.  He continually represented to Wendt that his experience would permit him to expand PilePro LLC's Modular Connector business in Europe and other countries better and more quickly than anyone else.

    b.     Wendt does not speak, read, or write German.  Heindl is a native German who speaks and writes English fluently.  Because a substantial amount of PilePro LLC's business would continue to be conducted in Germany, PilePro LLC and Wall-Profile needed a German-speaking manager.

    c.     Wendt lived in, and worked from, the United States.  Heindl lived in Munich, Germany.  Therefore, Heindl would be more readily available to many of the customers to whom PilePro LLC wanted to continue selling connector products.   In addition, Heindl was also more readily available to deal with the German and Austrian steel mills used to manufacture ISH's Modular Connectors.

    d.     Wendt was not deeply familiar with German financial, tax, and business regulations.  Heindl, on the other hand, had worked for ISH for nine years and repeatedly

20

**CORRECTED COMPLAINT**

represented that he was very familiar with Germany's business, tax, and regulatory environment, particularly as they pertained to the Connector Market.

e.      Heindl claimed to have experience in the International Connector Market and with ISH's existing customers, suppliers, and business operations.  Heindl also represented that he could maintain and expand those relationships for the benefit of Wall-Profile and PilePro LLC.

72.     Wendt gave Heindl the following responsibilities, among others Heindl assumed as Wall-Profile's on-site manager,

a.      controlling Wall-Profile's bank accounts in Germany;

b.      disbursing company funds with his sole signature;

c.      properly accounting for Wall-Profile's financial transactions and reporting;

d.      establishing and maintaining Wall-Profile's books and records;

e.      working with Wall-Profile's bookkeeping and tax professionals to ensure the company maintained complete and accurate financial records;

f.      preparing and overseeing the company's participation in all financial audits by the German tax authorities;

g.      preparing and filing Wall-Profile's tax reports;

h.      servicing Wall-Profile's existing customers and developing new customers; and

i.      developing and maintaining Wall-Profile and PilePro LLC's relationships with the European steel mills that were manufacturing Modular Connectors and other companies supplying products to the PilePro Plaintiffs.

21

**CORRECTED COMPLAINT**

73.     Heindl was also given discretion to select Wall-Profile's employees and many of the professionals that would provide Wall-Profile with accounting, engineering, and other services.  Heindl selected people who had been loyal to him over the course of many years. They included, but were not limited to:

a.      Doering:  Doering was Heindl's personal assistant.  Doering had worked with Heindl at ISH for many years before PilePro LLC purchased the Connector Business Assets.  At Wall-Profile, Doering was deeply involved with bookkeeping, accounting, and tax reporting responsibilities.  She was often responsible for communicating and coordinating operational and financial matters between PilePro LLC in the United States and Wall-Profile in Germany.  She also communicated with customers and suppliers.

b.      Maximilian Maier ("Maier"):  Maier was Wall-Profile's accountant and tax consultant.  Maier had provided accounting and tax services to Wall and ISH for a number of years before PilePro LLC purchased the Connector Business Assets.  Heindl retained him to continue providing those services to Wall-Profile.

c.      Otto Birkenmaier ("Birkenmaier"): Birkenmaier was retained to provide engineering services relating to Modular Connector designs.  For a number of years before PilePro LLC purchased the Connector Business Assets, Birkenmaier had been helping Wall and ISH engineer and patent their connector designs. Heindl retained Birkenmaier to perform those same services for Wall-Profile.

74.     Heindl also exerted significant influence over PilePro LLC's selection of a patent attorney.  At the time he communicated his recommendation to PilePro LLC, Heindl was aware that the patent attorney for PilePro LLC would have a critical role and would be responsible for drafting, filing, administering, and enforcing PilePro LLC's patents worldwide.   Heindl

22

**CORRECTED COMPLAINT**

recommended that PilePro LLC hire Weigel, who was, at the time, a young attorney practicing in Munich, Germany where Wall-Profile maintained its office.  Weigel is also Birkenmaier's son-in-law.  Based solely on Heindl's recommendation, PilePro LLC retained Weigel.

75.     Because Heindl had significant responsibilities for Wall-Profile's business operations, Wendt agreed to make him a highly compensated employee.  Other than Wendt himself, Heindl was the most highly compensated employee in the PilePro group of companies.

76.     Because Wall-Profile's financial success was important to PilePro LLC's overall financial success, Wendt told Heindl that he might ultimately receive additional compensation in the form of a share of profits or equity.  Heindl's opportunity to receive a share of profits or equity was completely discretionary and was to be based on Wall-Profile's financial success and Heindl's contribution to that success, as well as the financial health of the PilePro group of companies as a whole, all in Wendt's sole judgment.

77.     Because Wendt did not reside in Germany and could not speak, read, or write the German language, Wendt placed great trust and confidence in Heindl.  As a result, Heindl had *de facto* dominion and control over Wall-Profile's day-to-day finances, business operations, bookkeeping, bank accounts, tax filings, and almost every aspect of its operations from October 2003 through April 2010.

78.     When Wall-Profile opened for business on November 1, 2003, it was using ISH's Modular Connector patents and trademarks; its existing office, address, telephone number, fax number; and its existing employees and professionals.  Unbeknownst to Wendt or PilePro LLC, Heindl often lied to customers, suppliers, and vendors, falsely stating that he had taken over the business from his "uncle Georg" and that he owned Wall-Profile together with its Modular

23

**CORRECTED COMPLAINT**

Connector business, even though Wall had sold his business to PilePro LLC and Heindl was merely an employee.

**F.     Heindl Did Not Have Any Ownership Interest In, Or Authority Over, PilePro LLC Or Its Assets.**

79.     Although Heindl was a highly compensated Wall-Profile employee with significant responsibilities, he did not have at any time any direct or indirect ownership interest in PilePro LLC.  Heindl also did not have any individual management authority over PilePro LLC's assets, business operations, or financial affairs.

80.     In light of the senior role Wendt envisioned Heindl playing in the PilePro group of companies, for a brief period of time during 2003, Wendt contemplated the possibility that Heindl would have the opportunity to acquire not only a share of profits of, but stock in, PilePro Inc., and become an officer of that company.  During that period of time, Wendt sent Heindl a letter, dated October 27, 2003, stating that Heindl would be named and recognized as the CEO of PilePro LLC pursuant to an operating agreement that would go into effect on October 31, 2003. ("October 2003 Letter").

81.     Notwithstanding the opportunity, Heindl declined to acquire stock in PilePro Inc. As a result, Heindl never became a stockholder in PilePro Inc.  Heindl also never became CEO of PilePro Inc.  Throughout the time he was affiliated with the PilePro group of companies, Heindl knew and understood that he was not the CEO of either PilePro LLC or PilePro Inc and also understood and knew that he was not an equity owner in either PilePro LLC, PilePro Inc, or Wall-Profile.

82.     At no time during his affiliation with the PilePro group of companies did Heindl ever have the authority to manage PilePro LLC's business operations or to possess, control, or

24

**CORRECTED COMPLAINT**

transfer PilePro LLC's assets.  Heindl knew and understood that he did not own, or have the

authority to possess, control, or transfer assets belonging to PilePro, LLC.

**G.    PilePro Entrusted Weigel With Stewardship Over, And Responsibility For, Its Global Patent Portfolio.**

83.    After purchasing the Connector Business Assets, PilePro LLC sought to extend its

technological advantage in the Domestic Connector Market and International Connector Market

by developing new Modular Connectors to meet customer needs, improve its business, and

increase its revenues.   To protect the technological advantage created by newly developed

Modular Connectors, PilePro LLC patented new Modular Connector designs.

84.    PilePro LLC entrusted Weigel with primary responsibility and stewardship over

its US and Non-US Patent Rights.

85.    Weigel was primarily responsible for analyzing and assessing the patentability of

new Modular Connectors in the United States, Germany, and other countries; comparing new

Modular Connectors to prior art; drafting all patent claims and specifications; drafting and filing

all patent applications in Germany, the United States, and other countries either personally or

through correspondent law firms that he supervised in each jurisdiction; shepherding all patent

applications through the registration process; managing all patent registrations, renewal fee

deadlines, and other administrative matters to ensure the continued validity and enforceability of

each patent in each jurisdiction; and advising PilePro LLC about enforcing its patent rights

against potential infringers.

86.    To facilitate administratively the protection of the US and Non-US Patent Rights,

PilePro LLC adopted and implemented certain policies and practices.  Among other things,

25

**CORRECTED COMPLAINT**

a.      Each new connector design was registered first with the German patent office.  After patent applications were filed in Germany, they were then filed in the United States and other countries throughout the world;

b.      All US and Non-US Patent Rights were owned by PilePro LLC;

c.      All patent applications submitted in connection with PilePro LLC's business were to identify Wendt and Heindl as co-inventors and were then to be concurrently assigned by the inventors to PilePro LLC; and

d.      Wendt was the ultimate decision-maker on all matters relating to patents developed by or for the benefit of PilePro LLC.

e.      This Complaint sometimes collectively refers to these policies as the "PilePro Patent Policies."

87.     Weigel was aware of, familiar with, and required to comply with the PilePro Patent Policies.

88.     During the course of representing PilePro LLC, Weigel also represented Wall-Profile, PilePro Sales, and other entities in the PilePro group of companies, including Contexo when it was formed in December 2007.  Whenever Weigel provided legal services to any entity related to, or affiliated with, PilePro LLC, including Contexo, Weigel knew and understood that he was providing services at the instruction of PilePro LLC and, ultimately, for the benefit of PilePro LLC.  In fact, Weigel submitted billing invoices to PilePro LLC for work performed on behalf of other entities, such as Contexo.  Weigel regularly received his instructions from Wendt and always sent his billing statements to Wendt and PilePro LLC in the United States for review, approval, and payment.

**CORRECTED COMPLAINT**

89.     Weigel was aware that Wendt was the ultimate decision-maker on matters relating to PilePro LLC's patents.  Weigel also knew that Heindl did not have the authority to own, possess, or transfer any patent rights away from PilePro LLC, including Non-US Patent Rights.

90.     As a result of the work he performed for the PilePro group of companies, Weigel gained detailed, proprietary, and confidential knowledge about the specific design characteristics and administrative standing of each PilePro LLC patent.

**H.     Heindl And Doering Concealed And Obscured Wall-Profile's Financial Information.**

91.     After acquiring the Connector Business Assets, Wendt implemented his business plan, modified the marketing, and began selling Modular Connectors to new customers and markets.  Within less than five years, PilePro LLC was generating approximately ten times more sales revenue than ISH had generated in its best year.

92.     As PilePro LLC's financial success increased under Wendt's leadership, Heindl and Doering, with Maier's help, increasingly frustrated Wendt's effort to obtain timely and accurate financial information about Wall-Profile's financial performance and obfuscated its financial dealings.   Among other things, Heindl, Doering, and Maier repeatedly delayed providing Wendt with Wall-Profile's accounting information and other financial reports. Moreover, even when financial information was provided, Heindl, Doering, and Maier provided the information in German, a language each knew that Wendt did not understand.  Heindl, Doering, and Maier frequently ignored Wendt's repeated requests to send information in English, a language in which they were all fluent.

93.     Heindl, Doering, and Maier's delay and obfuscation complicated Wendt's ability to track Wall-Profile's financial dealings, understand how Wall-Profile's money was being

27

**CORRECTED COMPLAINT**

spent, or ascertain Wall-Profile's true financial performance, especially as the business began to grow exponentially.

94.     Without an independent means to assess Wall-Profile's financial dealings, Wendt was completely reliant on Heindl, Doering, and Maier for financial information relating to Wall-Profile.  Wendt knew only what they told him in English and had no basis at the time to conclude that Heindl, Doering, and Maier were deliberately providing false and misleading financial information.

95.     In fact, Heindl was providing false financial information as part of his scheme to divert cash and assets to himself and the other RICO Defendants, as further described below.

**I.      PilePro LLC Hired Humphrey Chang.**

96.     From its modest beginnings in October 2003, Wendt developed PilePro LLC's Modular Connector business into a fast-growing, financially successful venture that generated significant profits.  To make PilePro LLC successful, Wendt travelled around the world selling its Modular Connectors.  As a result, he found himself unable to attend personally to much of the minutia of the company's day-to-day business matters.  Moreover, as with many startup ventures, PilePro LLC's rapid growth frequently outpaced the implementation of suitably developed accounting procedures that would enable Wendt to regulate, record, and track the flow of money into and out of company accounts on a real-time basis.

97.     As both its global business and difficulty obtaining timely financial information from Germany increased, PilePro LLC and Wendt began to hire additional employees.  Given the responsibilities imposed by his role as PilePro LLC's leader, Wendt delegated and entrusted many tasks to those employees.  Once delegated, Wendt trusted the employees to act in the company's best interests.

**CORRECTED COMPLAINT**

98.     In or about May 2006, PilePro LLC hired Chang to provide business consulting services.  Chang represented himself as being especially skilled at, among other things, trade development, international purchasing, corporate formation, legal structures, finance, and tax planning.

99.     Shortly after he was hired, Wendt tasked Chang with the responsibility for accomplishing the following objectives:

      a.     Review and analyze PilePro LLC's and Wall-Profile's books and records in order to prepare accurate, complete, and relevant financial reports and assist PilePro LLC in obtaining a line of credit for its business needs;

      b.     Negotiate and obtain a line of credit that would permit PilePro LLC to expand its business and increase its sales revenues;

      c.     Develop accounting control and reporting systems for both PilePro LLC and Wall-Profile so that Wendt could receive timely, accurate, and meaningful financial and business operations information in English.

      d.     This Complaint will sometimes refer to these objectives collectively as the "Financial Objectives."

100.    Notwithstanding Chang's efforts, Heindl, Doering, Maier continued to frustrate efforts by PilePro LLC and Wendt to obtain timely, accurate, and meaningful financial information relating to Wall-Profile.  Consequently, Wendt authorized Chang to travel from the United States to meet with Heindl, Doering, and Maier in Germany, to physically review the books and records in person, and to set up a system for ensuring timely, accurate, and meaningful financial reporting in a format and language he could understand and use.

29

**CORRECTED COMPLAINT**

101.    Shortly after his return, Wendt hired Chang to be PilePro LLC's fulltime Chief Financial Officer ("CFO").  Chang held the CFO position until his termination on April 20, 2011.

102.    By December 2006, Wendt and PilePro LLC became concerned about finding solutions to three significant problems:

    a.    PilePro LLC and Wendt became worried about the financial risks associated with the potential for patent litigation in an increasingly litigious patent environment.  PilePro LLC's patent portfolio was both valuable and growing.  Therefore, Wendt and PilePro LLC wanted to protect the company against potential litigation risks.

    b.    PilePro LLC and Wendt wanted to expand PilePro LLC's Modular Connector business in the International Connector Market.

    c.    PilePro LLC and Wendt wanted to find a reliable way of managing Wall-Profile's finances and obtain accurate and timely financial reports.

    d.    This Complaint will sometimes refer to these objectives collectively as the "Business Problems."

103.    Wendt assigned Chang the responsibility for solving the Business Problems.

104.    In late 2006 or early 2007, Chang recommended that Wendt and PilePro LLC reorganize the company.  He represented that his proposed reorganization would enable PilePro LLC to achieve the Financial Objectives, solve the Business Problems, and provide certain domestic and foreign tax benefits.  In connection with the proposed reorganization, Chang recommended the following:

    a.    Chang recommended to Wendt that PilePro LLC adopt a holding company/operating company structure.  More specifically, Chang represented that

30

**CORRECTED COMPLAINT**

PilePro LLC should become a holding company that owned patents and other intellectual property, but not sell products or provide services, as it had historically done.  Chang also represented that PilePro LLC should cause the creation of a new company to license PilePro LLC's patents, manufacture Modular Connectors under that license, and sell Modular Connectors in the Domestic Market and the International Market.

      b.     Chang further recommended to Wendt that PilePro LLC should create holding company/operating company structures in various regions of the world.   In particular, Chang recommended that PilePro LLC and a new operating company should become the regional holding/operating company for the North and South American regions.   In addition, Chang recommended to Wendt that PilePro LLC should create holding company/operating company structures in Europe and, perhaps, Southeast Asia.

105.    Based on Chang's recommendations, Wendt instructed Chang to proceed with the reorganization.  In particular, Wendt authorized Chang to (i) convert PilePro LLC into a patent holding company, (b) form a new operating company in the United States, and (c) form a new patent holding company in Europe (the "Reorganization Plan").

106.    In light of Heindl's contribution to PilePro LLC's success, and as part of the Reorganization Plan, Wendt also instructed Chang to give Heindl an equity interest in both the new United States operating company and the new European patent holding company.

107.    In early 2007, Chang began the process of implementing the Reorganization Plan.  Among other actions, Chang did the following:

      a.     On January 18, 2007, Chang caused PilePro Sales to be formed in the State of Nevada to act as the operating company in conjunction with PilePro LLC. Though affiliated with PilePro LLC, PilePro Sales has a different ownership structure

**CORRECTED COMPLAINT**

from, and is not a subsidiary of, PilePro LLC.  As Wendt requested, Heindl received an equity interest in PilePro Sales.

       b.      Following the formation of PilePro Sales, PilePro LLC stopped selling Modular Connectors in the Domestic and International Markets.

       c.      On March 15, 2007, Chang caused PilePro LLC and PilePro Sales to enter into a licensing agreement under which PilePro Sales began to produce, market, and sell Modular Connectors in the Domestic Market and the International Market in the place of PilePro LLC.

       d.      On April 20, 2007, Chang and Heindl caused PilePro LLC to sell all of its stock in Wall-Profile to PilePro Sales.  As a result, Wall-Profile became a wholly-owned subsidiary of PilePro Sales, and Heindl became an indirect minority owner of Wall-Profile.  After the stock was transferred to PilePro Sales, Wall-Profile began producing, marketing, and selling Modular Connectors under the license granted to PilePro Sales.

108.    Unbeknownst to Wendt and PilePro LLC, Chang did not work with the intention of achieving the Financial Objectives and solving the Business Problems.  Instead, Chang, Heindl, and others took advantage of the substantial amounts of cash generated by PilePro LLC's financial success, the company's lack of sufficiently mature internal controls, and the opportunities afforded by Wendt's style of "hands off" delegation to enrich themselves by defrauding PilePro LLC and its related companies.  During the process of reorganizing PilePro LLC, Chang, Heindl, and others conspired to devise and execute a plan to misappropriate not only PilePro LLC's cash, but also its patent rights and  business opportunities so that they could begin their own Modular Connector business and compete unlawfully and directly against PilePro LLC in the Domestic Market and the International Connector Market.

32

**CORRECTED COMPLAINT**

GENERAL RICO AND RACKETEERING ALLEGATIONS

**The Racketeering Enterprise**

109.    At all times relevant to this Complaint, RICO Defendants Heindl, Chang, Weigel, and Steelwall GmbH, together with RICO Co-Conspirators Farroni, Harzenmoser, Doering, Contexo, Steelwall Holding, and Eastlink Capital, as well as other individuals and entities, were employed by, associated with, and constituted a racketeering enterprise, as defined in 18 U.S.C. 1961(4), that is a group of individuals, corporations or other legal entities which are associated together in fact ("Enterprise").  The Enterprise is an organization whose members and associates engaged in crimes, including wire fraud, money laundering, and interstate transportation of stolen goods.

110.    The Enterprise engaged in, and its activities affected, interstate and foreign commerce.

111.    The leadership of the Enterprise is currently based in California and in Munich, Germany.  The Enterprise operates in the United States and internationally.

112.    The Enterprise has a structure that is distinct from the racketeering activity described below.  Among other things, the RICO Defendants and RICO Co-Conspirators:

a.    created and used a system for guiding and directing the activities and affairs of the Enterprise on a continuing basis; and

b.    created, operated, and continue to operate, various business entities that market and sell Modular Connectors in the Domestic and International Markets.

113.    The Enterprise is an ongoing organization whose members functioned, and continued to function, as a continuing unit for the common purpose of achieving the Enterprise's objectives.

33

**CORRECTED COMPLAINT**

114.   The criminal conduct of the Enterprise was directed principally, though not exclusively, by its two leaders: Humphrey Chang, currently based in California, and Richard Heindl, currently based in Germany.  At various periods of time between October 2006 and May 2011, Chang and Heindl organized, directed, and conducted the affairs of the Enterprise from Austin, Texas and California.  At various times during the Enterprise's operations, Chang and Heindl were assisted by other individuals and entities in the United States, Germany, Switzerland, and other countries around the world.

115.   <u>RICO Defendant Chang</u>. Chang is the mastermind of the Enterprise's schemes and artifices to defraud the PilePro Plaintiffs and the Enterprise's objective to supplant the PilePro group of companies in the Domestic and International Connector Markets.  Using the authority, resources, and information available to him by virtue of his role as CFO for PilePro LLC and PilePro Sales, Chang directed the affairs of the Enterprise from Austin, Texas and also from California.  Chang had full and unfettered access to proprietary business and financial information used by PilePro LLC, PilePro Sales, and other PilePro companies.  Among other things, Chang used his position with PilePro LLC and PilePro Sales to

a.   persuade Wendt and PilePro LLC to adopt and implement unknowingly business goals, practices, and decisions that, unbeknownst to Wendt, were intended to further the Enterprise's schemes;

b.   oversee, control, manage, and divert the location and flow of money and other assets belonging to PilePro LLC, PilePro Sales, and Wall-Profile in order to further the Enterprise's purposes and accomplish its schemes;

c.   conceal the pattern of racketeering activity and the purpose of the transactions conducted in furtherance of the Enterprise's objectives;

34

**CORRECTED COMPLAINT**

d.      authorize the transfer of funds from PilePro LLC or PilePro Sales in the United States to Wall-Profile in Germany in order to further the Enterprise's purposes and accomplish its schemes;

e.      create, manage, and direct the affairs of various corporations, including Contexo, and other entities through which the Enterprise is seeking to accomplish its objectives;

f.      influence PilePro LLC's business decisions and activities in ways that facilitated the Enterprise's ability to achieve its objectives; and

g.      compromise and weaken the PilePro Plaintiffs relationship with their customers, suppliers, and banks in order to facilitate the Enterprise's attempt to supplant the PilePro group of companies in the Domestic and International Market.

116.    Chang concealed his participation in, and role with, the Enterprise by using a number of different, non-company email addresses and telephone numbers to conduct business relating to the Enterprise, as well as business involving PilePro LLC, PilePro Sales, and other PilePro-affiliated companies.

117.    After Heindl's termination from PilePro Sales and Wall-Profile on April 17, 2010, Chang continued to work as CFO for PilePro LLC and PilePro Sales.  Chang also continued to conceal his participation in the Enterprise and continued to communicate with, and direct the activities of, individuals and entities associated with the Enterprise, including, but not limited to, providing those individuals and entities with confidential PilePro information.

118.    After an investigation conducted by PilePro LLC uncovered misconduct and malfeasance, Chang was terminated on April 20, 2011.

**CORRECTED COMPLAINT**

119.   To conceal the Enterprise and the Pattern of Racketeering Activity, Chang retained and refused to return a company laptop and multiple company hard drives for a period of months after his termination.  When Chang finally returned the computer devices, PilePro LLC and PilePro Sales discovered that Chang had encrypted the laptop hard drive and deleted all data from the other hard drives.

120.   Chang now openly associates with the RICO Defendants and RICO Co-Conspirators, and openly acts to further the Enterprise's purposes.  Among other things, Chang represents himself as being a partner in Steelwall GmbH and formally identifies himself as its North American Sales & Marketing Director.  Chang, therefore, profits personally from the activities Steelwall GmbH.  Chang is personally marketing and selling connectors that have been designed using patent rights the Enterprise fraudulently misappropriated from PilePro LLC, as described below.   In addition, Chang has falsely contradicted and repudiated affidavits previously submitted on behalf of PilePro companies in German court proceedings.  He has done so with the intention of furthering the Enterprise's objectives to acquire fraudulently PilePro LLC's intellectual property.

121.   RICO Defendant Heindl.  Heindl's position with Wall-Profile was also integral to the Enterprise's success.  Among other things, in his capacity as manager, and for a period of time, managing director of Wall-Profile, Heindl had the discretion and autonomy to direct that company's activities in ways that furthered the Enterprise's objectives.  Abusing his authority to distribute money from Wall-Profile's bank accounts using his sole signature, Heindl was able to divert money to benefit the Enterprise and himself.  Because he was directly responsible for Wall-Profile's day-to-day operations and financial reporting requirements, Heindl was able to conceal the racketeering activity.  Heindl's positions with PilePro Sales and Wall-Profile gave

36

**CORRECTED COMPLAINT**

him access to confidential and proprietary business information, and allowed him to use that information for the Enterprise's purposes.   In addition, Heindl owned a beneficial interest in Contexo's stock.   Therefore, Heindl occupied a unique position.   He held a beneficial stock interest in Contexo and also had possession of the October 2003 Letter.   The dual role enabled Heindl to play a key role in, and personally profit from, the fraudulent transfer of the Non-US Patent Rights from PilePro LLC to Contexo for the benefit of the Enterprise.   Among other things, Heindl was able to use his position to further the Enterprise's objectives by:

      a.     causing Wall-Profile to request the transfer of funds from PilePro LLC and PilePro Sales in the United States to Wall-Profile in Germany in order to obtain cash to facilitate the Enterprise's objectives;

      b.     causing Wall-Profile to transfer funds that it received from PilePro LLC or PilePro Sales in the United States to Contexo in Switzerland to fund the Enterprise's activities;

      c.     concealing the racketeering activity from Wendt, PilePro LLC, and PilePro Sales, including the fact that he and other RICO Defendants and RICO Co-Conspirators were benefiting personally from Wall-Profile's financial transactions and from the valuable patent rights that were being surreptitiously transferred to entities controlled by the Enterprise;

      d.     establishing and operating Steelwall GmbH, Steelwall Holding, and other companies to market and sell Modular Connectors using the fraudulently misappropriated patent rights;

37

**CORRECTED COMPLAINT**

e.     using confidential and proprietary information belonging to Wall-Profile to divert business away from PilePro LLC, PilePro Sales, and other PilePro-affiliated companies and to companies controlled by the Enterprise.

122.    Heindl used his relationships with Wall-Profile's employees, professionals, steel manufacturers, and other vendors to clone Wall-Profile, duplicate its Modular Connectors, and divert business and production capacity from PilePro LLC, PilePro Sales, and Wall-Profile to the Enterprise.  Just as Heindl had earlier represented that he owned Wall-Profile, he was and is now representing that Steelwall GmbH has replaced Wall-Profile and that he is continuing his "uncle Georg's" business and "his life's work" through Steelwall GmbH.

123.    RICO Defendant Weigel. Weigel played a critical role in the Enterprise.  Weigel was PilePro LLC's lead patent attorney.  In connection with that position, Weigel held a power of attorney that authorized him to act in PilePro LLC's name before the German Patent and Trademark Office, the European Community Patent Office, and the patent offices of other jurisdictions.  Wendt and PilePro LLC also caused Weigel to be the patent attorney for Contexo. As a result, Weigel also held a power of attorney for Contexo.  In addition, Weigel directed, and was responsible for, the activities of law firms in other jurisdictions, including the United States, with respect to PilePro LLC's patents.   While representing PilePro LLC, Weigel acquired significant, proprietary, and confidential information about PilePro LLC's patented connector technologies and about PilePro LLC's confidential business information. Weigel also maintained PilePro LLC's patent files and related legal work product in his office.   Among other things, Weigel was able to use his positions, powers, and relationships in connection with both PilePro LLC and Contexo to further the Enterprise's objectives by:

38

**CORRECTED COMPLAINT**

a.     fraudulently initiating the transfer of patent rights from PilePro LLC to Contexo without the knowledge or consent of PilePro LLC and Wendt;

b.     creating and coordinating the execution of a backdated assignment for the specific purpose of fraudulently transferring the Non-US Patents LLC from PilePro to Contexo;

c.     fraudulently causing patent offices around the world to transfer the Non-US Patent Rights from PilePro LLC to Contexo;

d.     fraudulently registering patents for new connectors developed by PilePro LLC in the name of Contexo instead of PilePro LLC;

e.     concealing the fact that he was representing Heindl to the detriment of, and in conflict with, the interests of PilePro LLC;

f.     fraudulently inducing Wendt and Dwight Williams, General Counsel of the PilePro group of companies, to allow him to continue as the patent attorney for PilePro LLC so that he could continue surreptitiously assigning the Non-US Patent Rights to Contexo; and

g.     actively aiding the RICO Defendants and RICO Co-Conspirators in litigation against PilePro LLC, other companies in the PilePro group, and suppliers for the PilePro group of companies.

124.   Weigel also used the confidential information gained while representing PilePro LLC to help Contexo apply for and register new Modular Connector patents based on PilePro LLC designs.

125.   <u>RICO Co-Conspirator Contexo</u>.  To further the purposes of the Enterprise, the RICO Defendants and RICO Co-Conspirators caused Contexo to be formed in Switzerland in

39

December 2007 to use Contexo to fraudulently acquire PilePro LLC's patent rights and fraudulently obtain substantial sums of money from PilePro LLC, PilePro Sales, and Wall-Profile.   To conceal the racketeering activity and the Enterprise's purposes, the RICO Defendants and RICO Co-Conspirators created the appearance that Wendt and PilePro LLC were the beneficial owners of Contexo stock and that PilePro LLC would control and benefit from Contexo's operations.

126.    To conceal the Enterprise and the racketeering activity, the RICO Defendants and RICO Co-Conspirators failed to disclose their roles and interests in Contexo to Wendt, PilePro LLC, or PilePro Sales.  In addition, the RICO Defendants and Co-Conspirators failed to disclose that they, together with other individuals and entities, reaped the benefits of Contexo's activities. By using Contexo in the manner described in this Complaint, the RICO Defendants and RICO Co-Conspirators were able to deceive Wendt, Williams, PilePro LLC, and PilePro Sales and to conceal their illegal activities.

127.    In furtherance of the Enterprise, the RICO Defendants and RICO Co-Conspirators fraudulently caused patent offices in Germany, the European Community, and other countries around the world to register valuable patents owned and developed by PilePro LLC in the name of Contexo.  To effectuate the fraudulent transfer of patent rights, the RICO Defendants and RICO Co-Conspirators, among other things, backdated assignment documents and falsely claimed that Heindl had authority to transfer the patent rights.   As a result of the RICO Defendants' and RICO Co-Conspirators' unlawful conduct, more fully described below, Contexo is now the registered if not rightful owner of many Modular Connector patents developed and rightfully owned by PilePro LLC.

**CORRECTED COMPLAINT**

128.    In furtherance of the Enterprise, and in an effort to deprive PilePro LLC of its rights to the Non-US Patents, the RICO Defendants and RICO Co-Conspirators have submitted false affidavits and have filed falsified and backdated documents in *Wall-Profile GmbH v. Contexo AG*, Case No.: I-2 W 58/10, pending in Dusseldorf, Germany ("German Litigation") and *PilePro LLC v Contexo, AG, et al.*, Case No. ES 2010 381, pending in Zug, Switzerland ("Swiss Litigation") as part of their effort to persuade those courts that PilePro LLC transferred its patents to Contexo.  On September 6, 2010, the Swiss Litigation court entered a preliminary injunction restricting Contexo's ability to use and transfer the fraudulently acquired patent rights. Notwithstanding the preliminary injunction, and in furtherance of the Enterprise, Contexo is nevertheless licensing the fraudulently registered patent rights to Steelwall GmbH, and possibly other entities, enabling them to market and sell Modular Connectors in the United States and other countries around the world.

129.    <u>RICO Co-Conspirator Farroni</u>. Farroni's role in the Enterprise was critical to its success.  Farroni is a Swiss lawyer who was retained by representatives of PilePro LLC for the specific purpose of forming Contexo.  At the time he was retained, Farroni knew that Contexo was being formed for the benefit of PilePro LLC.  Farroni was also a trustee director for Contexo under Swiss law and assumed fiduciary obligations to Contexo's stockholders, including Wendt, and to PilePro LLC.  In accepting his position, Farroni understood that he was to act only upon instructions from PilePro LLC through Wendt and Heindl, who were to hold Contexo's stock for the benefit of PilePro LLC.

130.    Farroni knowingly, intentionally, and fraudulently participated in the racketeering activity in order to further the Enterprise's purposes.  Among other things, Farroni:

**CORRECTED COMPLAINT**

a.      disavowed Wendt's interest in Contexo and acted as if Contexo was owned only by Heindl, Harzenmoser, and himself;

b.      conspired with Chang, Heindl, and Harzenmoser to transfer fraudulently patent rights from PilePro LLC to Contexo;

c.      participated in backdating documents used to create the appearance that PilePro LLC had assigned its patent rights to Contexo;

d.      falsified documents purporting to memorialize discussions that never occurred at Contexo meetings;

e.      received large sums of money into Contexo's bank accounts and, thereafter, disbursed those funds in furtherance of the Enterprise; and

f.      participated in forming Steelwall Holding and Steelwall GmbH to compete against his clients, PilePro LLC and Wendt.

131.    RICO Co-Conspirator Harzenmoser.    Farroni recruited Harzenmoser to be Contexo's second trustee director.   At the time he was recruited, Harzenmoser knew that Contexo was being formed for the benefit of PilePro LLC.  Like Farroni, Harzenmoser accepted a fiduciary position as a trustee director under Swiss law.  Upon accepting his position, Harzenmoser understood that he was to act only upon instructions from PilePro LLC through Wendt and Heindl, who were to hold Contexo's stock for the benefit of PilePro LLC.

132.    Harzenmoser knowingly, intentionally, and fraudulently participated in the racketeering activity in order to further the Enterprise's purposes.   Among other things, Harzenmoser:

a.      disavowed Wendt's interest in Contexo and acted as if Contexo was owned only by Heindl, Farroni, and himself;

42

**CORRECTED COMPLAINT**

b.        conspired with Chang, Heindl, and Farroni to transfer fraudulently  patent rights from PilePro LLC to Contexo;

c.        participated in backdating documents used to create the appearance that PilePro LLC had assigned its patent rights to Contexo;

d.        falsified documents purporting to memorialize discussions that never occurred at Contexo meetings;

e.        received large sums of money into Contexo's bank accounts and, thereafter, disbursed those funds in furtherance of the Enterprise;

f.        participated in forming Steelwall Holding and Steelwall GmbH to compete against his clients, PilePro LLC and Wendt.

133.   _RICO Co-Conspirator Steelwall Holding_.   To further the purposes of the Enterprise, the RICO Defendants and RICO Co-Conspirators formed Steelwall Holding in Switzerland on June 22, 2010.  Steelwall Holding was formed as part of the RICO Defendants' and RICO Co-Conspirators' attempt to "launder" the Non-US Patent Rights by transferring them from Contexo, in which Wendt and PilePro LLC have an ownership interest, to Steelwall Holding, where Wendt and PilePro LLC would have no such interest.  Heindl owns sixty-six percent of the Steelwall Holding stock; CRC Treuhand AG, a company affiliated with Harzenmoser, owns fourteen percent of the stock; and Harzenmoser and Farroni each own ten percent of the stock individually.  Steelwall Holding was formed for the purpose of aiding and abetting the RICO Defendants' and RICO Co-conspirators' racketeering activity by making it possible for them to claim the unfettered ownership to the Non-US Patent Rights and to exploit the illegally and fraudulently acquired patent rights in the Domestic and International Markets.

43

**CORRECTED COMPLAINT**

134.   <u>RICO Defendant Steelwall GmbH</u>.  To further the purposes of the Enterprise, the RICO Defendants and RICO Co-Conspirators formed Steelwall GmbH in Germany on August 2, 2010.  Steelwall Holding currently owns stock in Steelwall GmbH.  As a result, Heindl, Farroni, and Harzenmoser personally profit from the activities in Steelwall GmbH through their stock ownership in Steelwall Holding.  In addition, Chang represents himself as being a partner in Steelwall GmbH.  Accordingly, he also profits personally from the activities of Steelwall GmbH.  Consistent with Chang's organizational structure, Steelwall GmbH was formed to be the operating company while Steelwall Holding was formed to be the patent holding company.  Steelwall GmbH was formed to exploit illegally and fraudulently patent rights that the Enterprise acquired through fraud.  Steelwall GmbH is currently producing, marketing, and selling Modular Connectors and related sealants in the Domestic and International Markets using the misappropriated Non-US Patent Rights.  Steelwall GmbH is participating in, and aiding and abetting, the RICO Defendants' and RICO Co-Conspirators' racketeering activity.

135.   Steelwall GmbH is being represented as the old Wall-Profile and the continuation of the company belonging to Heindl's "uncle Georg."  Steelwall GmbH manufactures and sells the same Modular Connectors previously sold by Wall-Profile.  In addition, it sells the identical chemical sealant PilePro calls "WADIT" under the name "Steelant."  Many of Steelwall's employees were Wall-Profile employees.  For example, Birkenmaier now provides engineering services to Steelwall instead of Wall-Profile.  In some cases, Steelwall employees may be using the same phone numbers as they previously used at Wall-Profile.  Steelwall is also using the customer lists created by PilePro LLC and Wall-Profile.  In an effort to confuse customers and obtain business it could not otherwise procure, the RICO Defendants and RICO Co-Conspirators

44

**CORRECTED COMPLAINT**

have attempted to operate Steelwall so that it appears to be PilePro Sales' subsidiary, Wall-Profile.

136.   RICO Co-Conspirator Doering. Doering was Heindl's personal assistant. She consulted with, and took direction from, Chang and Heindl concerning decisions and activities of the Enterprise, including but not limited to the fraudulent transfer of funds from PilePro LLC's bank accounts in the United States to Wall-Profile's bank accounts in Germany, and then to Contexo's bank accounts in Switzerland, in order to fund the Enterprise's activities and to enrich the RICO Defendants and RICO Co-Conspirators.   In addition, Doering consulted with and participated in backdating documents used by the RICO Defendants and RICO Co-Conspirators to support their fraudulent registration of the Non-US Patent Rights and the New Connector Patent Rights in Contexo's name.   Doering also aided, abetted, and concealed Heindl's diversion of the PilePro Plaintiffs' funds for his own personal benefit and self-interest.

137.   RICO Co-Conspirator Eastlink Capital. Eastlink Capital is wholly owned and controlled by Chang.   The RICO Defendants and RICO Co-Conspirators use Eastlink Capital to further the Enterprise's purposes by, among other things, importing Modular Connectors and Steelant into the United States from Germany.

## PURPOSES OF THE ENTERPRISE

138.   The RICO Defendants, RICO Co-Conspirators, and other individuals and entities sought to accomplish the purposes of the Enterprise through racketeering activity.   The racketeering activity included, among other things, schemes and artifices to defraud, money laundering, the interstate and foreign transportation of goods and individuals, and other crimes.

139.   The purposes of the Enterprise included, but are not limited to, the following:

**CORRECTED COMPLAINT**

a.      Enriching financially the RICO Defendants, RICO Co-Conspirators, and other individuals and entities associated with the Enterprise by means of racketeering activity;

b.      Fraudulently acquiring the patent and other intellectual property rights and assets by means of racketeering activity;

c.      Using the fraudulently acquired money, patent and other intellectual property rights to enter into, participate in, and profit from the Domestic and International Connector Markets; and

d.      Attempting to supplant and replace the PilePro Plaintiffs and their affiliated companies in the Domestic and International Connector Markets after misappropriating the PilePro Plaintiffs' assets.

## RACKETEERING ACTIVITY

140.    At all times relevant to the allegations in this Complaint, the RICO Defendants and RICO Co-Conspirators directly and indirectly conducted, and participated in the conduct of, the affairs of the Enterprise through a Pattern of Racketeering Activity, as that term is defined in 18 U.S.C. § 1961(5).  The racketeering activities and Patterns of Racketeering Activity caused injury to the PilePro Plaintiffs' business and property.

141.    As part of their Racketeering Activity, the RICO Defendants and RICO Co-Conspirators devised and conspired to devise schemes and artifices to defraud for the purpose of obtaining money and property by means of wire fraud, money laundering, the interstate transportation of individuals, and other criminal acts, which schemes are more fully described in this Complaint.

46

**CORRECTED COMPLAINT**

142.    To accomplish their schemes and artifices to defraud, the RICO Defendants and RICO Co-Conspirators used interstate and foreign telephone and wire services, in violation of 18 U.S.C. § 1343 (relating to wire fraud); engaged in financial transactions using the proceeds of unlawful activity, in violation of 18 U.S.C § 1956(a)(1)(A)(i) and 18 U.S.C. § 1956(a)(2)(A) and (B)(i) (relating to money laundering); engaged in monetary transactions using criminally derived property, in violation of 18 U.S.C. § 1957 (relating to money laundering); transported and caused to be transported various persons in interstate and foreign commerce, in violation of 18 U.S.C. § 2314 (relating to interstate and foreign transportation of a person for purposes of committing fraud); and participated in racketeering activity, in violation of 18 U.S.C. § 1962(c) and (d) (relating to RICO).

143.    At all times relevant hereto, the RICO Defendants' and RICO Co-Conspirators' conduct and activities with respect to the Enterprise constituted criminal offenses which are indictable by the United States of America pursuant to 18 U.S.C. §§ 1343, 1956, 1957, and 2314.

144.    At all times relevant hereto, the Enterprise formed and operated by the RICO Defendants and RICO Co-Conspirators was engaged in, and its activities affected, interstate and foreign commerce.

145.    A nexus exists among the pattern of racketeering activity, the Enterprise, and the United States.  Among other things, (a) the Enterprise and the schemes through which it operates were conceived, orchestrated, and directed in, and from, the United States; (b) significant predicate acts took place in, and/or emanated from, the United States; (c) the Enterprises' schemes were intended to defraud and harm individuals in the United States and companies organized, operating, headquartered in the United States; (d) the Enterprises' schemes were intended to steal money, property, and interests in property owned by companies organized,

47

**CORRECTED COMPLAINT**

operating, and headquartered in the United States; (e) the RICO Defendants and RICO Co-Conspirators engaged in significant acts in furtherance of the schemes and the Enterprise in the United States; (f) the RICO Defendants and RICO Co-Conspirators directed significant unlawful acts toward the United States with the intent to cause direct injury to companies and individuals in the United States.

146.    The acts of the RICO Defendants and RICO Co-Conspirators, as more fully described herein, have the same or similar purposes, results, participants, victims, or methods of commission.  The acts are interrelated by distinguishing characteristics, are not isolated events, and amount to or pose a continued threat of criminal activity.  The methods of acting, described below, constitute a regular manner in which the RICO Defendants and RICO Co-Conspirators conducted, and continue to conduct, their on-going business.

147.    As a result of the RICO Defendants and RICO Co-Conspirators' violations of 18 U.S.C. § 1962, the PilePro Plaintiffs have been injured in their business and property in an amount in excess of $75,000.  In addition, the PilePro Plaintiffs have been required to retain counsel to prosecute this action, and are entitled to an award of attorneys' fees and costs of suit incurred herein.

## THE PATTERN OF RACKETEERING ACTIVITY

148.    From approximately the fall of 2007, through the present, the RICO Defendants and RICO Co-Conspirators, and each of them, willfully, knowingly, and with the intent to defraud, devised, and intended to devise, schemes and artifices to defraud for the purpose of accomplishing the Enterprise's objectives, including but not limited to, obtaining money and property from the PilePro Plaintiffs by improper means.  In order to accomplish their schemes

48

**CORRECTED COMPLAINT**

and artifices to defraud, the RICO Defendants and RICO Co-Conspirators engaged in a Pattern of Racketeering Activity.

149.    The Pattern of Racketeering in which the RICO Defendants and RICO Co-Conspirators engaged is, in substance, as follows:

**The Business Usurpation Schemes**

150.    From at least the fall of 2007 through and including the present, the RICO Defendants and RICO Co-Conspirators knowingly and intentionally devised, and participated in, schemes and artifices to defraud the PilePro Plaintiffs by (a) stealing patent rights and business opportunities belonging to the PilePro Plaintiffs and (b) defrauding them of substantial sums of money ("Business Usurpation Schemes").   The RICO Defendants and RICO Co-Conspirators devised, implemented, and executed the Business Usurpation Schemes in order to fraudulently acquire the financial capital and intellectual property assets to enable the Enterprise to enter into, compete in, and profit from the Domestic and International Connector Markets.

151.    The RICO Defendants' and RICO Co-Conspirators' fraudulent schemes used a variety of means and methods, each of which was undertaken to further the purposes of the Enterprise.   The fraudulent schemes included, but were not limited to, the following:

152.    <u>The Reorganization Fraud</u>:   As part of the Racketeering Activity, the RICO Defendants and RICO Co-Conspirators caused Contexo to be formed in Switzerland on December 10, 2007 under the guise of implementing the Reorganization Plan.   Instead, Contexo was, in fact, formed by the RICO Defendants and RICO Co-Conspirators to (a) obtain fraudulently and illegally valuable patent rights from PilePro LLC, (b) obtain money from PilePro LLC and PilePro Sales; (c) enable the Enterprise to profit from using the illegally

49

**CORRECTED COMPLAINT**

obtained patent rights and money in the Domestic and International Connector Markets ("Reorganization Scheme").

153.    In furtherance of the Enterprise, the RICO Defendants and RICO Co-Conspirators used the Reorganization Plan as a means to carry out the Racketeering Activity and, more particularly, the Reorganization Scheme.  The RICO Defendants and RICO Co-Conspirators deliberately devised the Reorganization Scheme to appear as if it were a lawful and legitimate part of the Reorganization Plan.  In order to conceal the Pattern of Racketeering and Contexo's role in the racketeering activity, the RICO Defendants and RICO Co-Conspirators did not disclose their interests in Contexo or its role in divesting PilePro LLC of its patent rights and PilePro LLC and PilePro Sales of substantial sums of money.

154.    Chang was primarily responsible for devising, directing, and implementing the Reorganization Scheme.  Beginning in November 2006 and continuing through April 2011, Chang represented to Wendt that he possessed the necessary experience and knowledge relating to international business laws, organizational structures, and tax planning to reorganize PilePro LLC to achieve the Financial Objectives and solve the Business Problems.  Chang repeatedly represented that the Reorganization Scheme was lawful, legitimate, and in PilePro LLC's long-term best interests.

155.    In particular, Chang made the following representations to Wendt and PilePro LLC concerning the Reorganization Scheme:

  a.    Chang represented to Wendt that when naming the Non-US regional holding and operating companies, PilePro LLC should not use the name "PilePro," or any derivation of "PilePro."  He represented to Wendt that different names would further protect PilePro from potential liability arising from litigation and also increase PilePro

50

**CORRECTED COMPLAINT**

LLC's opportunity to sell Modular Connectors and WADIT to companies that had historically not done business with PilePro LLC and/or that had elected to do business with regional companies.

b.      Chang represented to Wendt that PilePro LLC should not own the stock in the foreign holding or operating companies for several reasons.  First, he represented that having some other person or entity own the stock would protect PilePro LLC from potential litigation liability.  Second, he represented that it would help companies wanting to do business with a regional supplier to feel more comfortable with the foreign holding or operating company.  Third, Chang represented that holding the foreign company's stock in PilePro LLC's name would create potential tax problems for PilePro LLC's existing members.

c.      Chang represented to Wendt that the foreign holding company stock should be held in "individuals'" names.  Chang represented that PilePro LLC would, nevertheless, remain, at all times, the beneficial owner of the foreign holding company stock and would control the foreign holding companies' activities and assets. Chang advised Wendt that his and PilePro LLC's beneficial ownership interest in, and control over, the foreign holding companies would be legally and properly documented.

d.      Chang represented to Wendt that the foreign holding companies should be formed in countries that allowed the names of stockholders to remain private so that their ownership interests would not be publicly known and could not be connected to PilePro LLC.

**CORRECTED COMPLAINT**

e.       Chang represented to Wendt that he should appoint, as officers and directors of the foreign holding companies, individuals who did not have any connection with PilePro LLC, but who would be bound to act only on instructions from PilePro LLC.

f.       Chang represented that the foreign companies should be operated by nominee officers and directors.  Chang told Wendt that using nominee directors was necessary to further distance PilePro LLC from the foreign companies, further protect PilePro LLC from potential liability from patent litigation, and further expand PilePro LLC's business globally.  Chang advised Wendt that he would ensure the directors would be bound to act on behalf PilePro LLC.

g.       Chang represented to Wendt that PilePro LLC should transfer most, if not all, of the Non-US Patent Rights to the regional holding companies.  Chang represented that transferring the patent rights would enable PilePro LLC to protect its most valuable assets -- the patent rights -- from possible patent litigation attacks.  Chang also advised Wendt that transferring the patent rights to the regional companies would make it easier for PilePro LLC to expand its business into new parts of the world.

h.       Chang represented to Wendt that he had investigated the business, banking, and tax laws of various countries.  Chang advised Wendt that, as a result of his investigation, PilePro LLC should become the patent holding company for North America.  He also represented that PilePro LLC should form a second holding company in Switzerland and another operating or holding company in Singapore.

i.       This Complaint sometimes refers to these representations as the "Reorganization Representations."

52

**CORRECTED COMPLAINT**

156.    Beginning in late November 2007, and continuing until April 2011, when he was terminated, Chang made the following additional representations to Wendt concerning the formation and organizational structure of Contexo:

a.      Chang represented that Wendt and Heindl, should Wendt elect to offer Heindl equity, would have an equal beneficial interest in Contexo when it was formed.

b.      Chang represented that Farroni and Harzenmoser were to be trustees for Contexo under Swiss law.  Chang further represented that Farroni and Harzenmoser knew that Contexo was being formed to operate for the benefit of PilePro LLC.

c.      Chang represented that Farroni and Harzenmoser were to be appointed as Contexo's directors.  Chang also represented that Farroni and Harzenmoser would each own one share of the 100 outstanding share of stock issued by Contexo in a fiduciary capacity for PilePro LLC in order to comply with then-existing Swiss law which required that a director also be a shareholder in the company.

d.      Chang represented that Farroni and Harzenmoser were bound by Swiss law and ethics governing corporate trustees to act solely for the benefit of PilePro LLC through Wendt's and Heindl's instructions.

e.      Chang represented that Contexo was under PilePro LLC's complete operational and financial control by virtue of Wendt's and Heindl's beneficial ownership and the legal and ethical obligations imposed by Swiss law on Farroni and Harzenmoser.

f.      Chang represented that binding legal documents existed to establish PilePro LLC's operational and financial control over Contexo through Wendt's and Heindl's beneficial ownership and through the fiduciary obligations imposed on Farroni and Harzenmoser.

53

**CORRECTED COMPLAINT**

g.      This Complaint sometimes refers to these representations as the "Contexo Representations."

157.   In furtherance of the Enterprise's purposes, and in order to implement the Reorganization Scheme, Chang, Heindl, Farroni, and Harzenmoser took the following actions:

a.      On November 13, 2007, at Chang's direction, Chang and Williams traveled from the United States to Switzerland to meet with Farroni concerning the formation of Contexo.  During the meeting Farroni recommended that PilePro LLC retain Harzenmoser as the second Contexo trustee director.

b.      On November 20, 2007, Chang issued instructions from the United States causing Heindl and Wall-Profile in Germany to wire transfer the sum of €100,000 from Wall-Profile's bank account in Germany to Farroni's bank account in Switzerland in order to capitalize Contexo in conformity with Swiss law.

c.      On December 5, 2007, at Chang's direction, Chang and Williams traveled from the United States to Switzerland to meet with Farroni and Harzenmoser.  During the meeting, Chang, Farroni, and Harzenmoser prepared documents establishing Wendt's stock ownership in Contexo and PilePro LLC's beneficial ownership of, and control over, Contexo ("Contexo Ownership Documents").   Farroni and Harzenmoser informed Williams that they would retain the Contexo Ownership Documents and send a complete set of Contexo formation and ownership documents to Williams in the United States once Contexo was officially organized in Switzerland.

d.      Upon returning to the United States following the December 5, 2007 meeting, Chang represented to Wendt that all necessary legal documentation supporting his stock ownership in, and PilePro LLC's control over, Contexo had been prepared.

54

**CORRECTED COMPLAINT**

e.      On December 10, 2007, Farroni and Harzenmoser officially formed Contexo in Switzerland.

f.      On or about December 19, 2007, Chang and Heindl caused PilePro LLC's counsel in the United States to draft a contract purporting to sell the Non-US Patent Rights to Contexo ("Assignment Contract").   In connection with the Assignment Contract, draft versions were sent via email between Utah, California, Texas, and Switzerland in December 2007, and January, February, and March 2008.   After discussions that spanned a period of months, Wendt and PilePro LLC declined to execute, and did not reach an agreement on the terms to be contained in, the Assignment Contract.   When Wendt and PilePro declined to execute the Assignment Contract, the RICO Defendants and RICO Co-Conspirators devised additional schemes to accomplish the Enterprise's goals.

g.      On December 21, 2007, Chang and Heindl caused PilePro LLC to wire transfer the sum of $145,000 USD from its bank account in the United States to Wall-Profile's bank account in Germany in order to reimburse Wall-Profile for the initial €100,000 capitalization of Contexo.

h.      In April 2008, Heindl paid for the 34.5 percent stock interest in PilePro Sales by transferring the sum of $10,200 from his bank account in Germany to PilePro Sales bank account in the United States.   Heindl called himself the "Vice-President, Director of Global Engineering & Technology Development" of PilePro Sales.

i.      In November 2008, Chang travelled from the United States to Singapore ostensibly for the purpose of locating a suitable business services agency to register the corporation and provide related services.

55

**CORRECTED COMPLAINT**

j.      In and around March 25, 2009, Chang also communicated from the United States with AsizBiz Services, pte, Ltd. in Singapore via email concerning finalizing the formation of a corporation in Singapore.

k.      This Complaint sometimes refers to these actions collectively as the "Reorganization Predicate Acts."

158.    Chang, Heindl, Farroni, and Harzenmoser made the Reorganization and Contexo Representations and participated in the Reorganization Predicate Acts in furtherance of the Enterprise.  Chang, Heindl, Farroni, and Harzenmoser knew the Reorganization and Contexo Representations were false and participated in the Reorganization Predicate Acts with the intention of deceiving and defrauding Wendt and PilePro LLC.

159.    Wendt and PilePro LLC relied on the representations made by Chang, Heindl, Farroni, and Harzenmoser.  Wendt and PilePro LLC did not know that the RICO Defendants and RICO Co-Conspirators formed, and intended to use, Contexo to fraudulently divest PilePro LLC of valuable patent rights and substantial amounts of money.  Wendt and PilePro LLC reasonably believed that Contexo was formed as part of the Reorganization Plan and that it was intended to enable PilePro LLC to achieve the Financial Objectives and solve the Business Problems.

160.    Contrary to the Reorganization Representations and the Contexo Representations, the RICO Defendants and RICO Co-Conspirators now assert that Wendt and PilePro LLC do not have, and have never had, any ownership interest in, or right of control over, Contexo.  The RICO Defendants and RICO Co-Conspirators contend that Heindl, Farroni, and Harzenmoser own and control Contexo, as well as the Non-US Patent Rights and all funds fraudulently transferred from PilePro LLC, PilePro Sales, and the PilePro group of companies to Contexo.

56

**CORRECTED COMPLAINT**

161.    In furtherance of the Enterprise, and to help defend their claim that they own and control, Contexo, the RICO Defendants and RICO Co-Conspirators:

a.    destroyed documentation in the United States and in Switzerland showing that Wendt owned a beneficial interest in Contexo and that Contexo was to be operated for the benefit of PilePro LLC;

b.    falsified documentation, including minutes of meetings, relating to and describing corporate acts and decisions of Contexo; and

c.    filed false affidavits, declarations, and documents in the German and Swiss Litigations in order to persuade those courts that Heindl, Farroni, and Harzenmoser are the sole stockholders in Contexo.

162.    As a result of the RICO Defendants' and RICO Co-Conspirators' conduct, Wendt and PilePro LLC have been deprived of their interests in Contexo.   Moreover, the RICO Defendants and RICO Co-Conspirators now claim, by virtue of the ownership of Contexo, to own and control the Non-US Patent Rights and substantial sums of money rightfully belonging to PilePro LLC.

163.    <u>The New Patent Fraud</u>.  As part of the Pattern of Racketeering Activity, the RICO Defendants and RICO Co-Conspirators devised a scheme to fraudulently register patents for new connectors developed by PilePro LLC after January 1, 2008 ("New Connectors") in the name of Contexo instead of PilePro LLC ("New Patent Scheme").  The RICO Defendants and RICO Co-Conspirators devised the scheme for the purpose of fraudulently acquiring the patent rights to the New Connectors ("New Connector Patent Rights").

164.    The RICO Defendants and RICO Co-Conspirators devised and executed the New Patent Scheme beginning in or about November 2007 and continuing through April 2010.  At the

**CORRECTED COMPLAINT**

time they devised the Scheme, the RICO Defendants and RICO Co-Conspirators knew that Chang's role as CFO and architect of the Reorganization Plan would enable him to persuade Wendt and PilePro LLC to authorize the registration of patents for the New Connectors in the name of Contexo.  They also knew that Weigel's role as PilePro LLC's lead patent attorney would enable him to register, and thereafter administer, patents for the New Connectors in the name of Contexo.   In order to conceal the Pattern of Racketeering Activity, and, more particularly, the New Patent Scheme, the RICO Defendants and RICO Co-Conspirators did not disclose their plans (a) to control Contexo, (b) to deprive PilePro LLC of its Non-US Patent Rights to the New Connectors, and (c) to subsequently use the Non-US Patent Rights for the New Connectors to compete against the PilePro group of companies in the Domestic and International Market.

165.    Between November 2007 and April 2010, Chang, Heindl, and Weigel repeatedly represented to Wendt and PilePro LLC that PilePro LLC should register the Non-US Patent Rights for New Connectors in the name of Contexo.  Among other things, Chang, Heindl, and Weigel made, and caused to be made, the following representations to Wendt, Williams, and PilePro LLC:

a.      Registering Non-US Patents Rights for the New Connectors in the name of Contexo would further the Reorganization Plan and solve the Business Problems;

b.      Contexo was controlled by PilePro LLC through its beneficial ownership in the stock held by Wendt and Heindl;

c.      Wendt and PilePro LLC would control the Non-US Patent Rights for the New Connectors, thereby permitting PilePro LLC to control the use and ownership of the

58

**CORRECTED COMPLAINT**

patent rights for its New Connectors, because Farroni and Harzenmoser would be legally required to follow each instruction given them by Wendt and PilePro LLC; and

     d.     PilePro LLC, and the other companies in the PilePro group, would have all rights necessary to use the Non-US Patent Rights in its business operations.

166.     During the same time period, Farroni and Harzenmoser made, and caused to be made, the following representations to Wendt, Williams, and PilePro LLC:

     a.     Assets held in the name of Contexo, including the Non-US Patent Rights, would be available for use by, and under the control of, PilePro LLC, through the beneficial stock ownership held by Wendt and Heindl; and

     b.     They would, as trustees with a fiduciary responsibility to the beneficial owners of the Contexo stock, follow, and cause Contexo to act in conformity with, all instructions received from PilePro LLC, through the beneficial stock ownership held by Wendt and Heindl.

     c.     This Complaint sometimes refers to the representations made by Chang, Farroni, and Harzenmoser concerning the New Connectors as the "New Connector Representations."

167.     Chang, Farroni, and Harzenmoser made the New Connector Representations and participated in furtherance of the Enterprise.  Chang, Farroni, and Harzenmoser knew the New Connector Representations were false and made them with the intention of deceiving and defrauding Wendt and PilePro LLC.

168.     Wendt and PilePro LLC relied on the representations made by Chang, Farroni, and Harzenmoser when authorizing the New Connectors to be registered in Contexo's name. Wendt and PilePro LLC did not know that the RICO Defendants and RICO Co-Conspirators

59

**CORRECTED COMPLAINT**

formed, and intended to use, Contexo to fraudulently divest PilePro LLC of valuable patent rights and substantial amounts of money.  Wendt and PilePro LLC reasonably believed that registering the New Connectors was intended to achieve the Financial Objectives and solve the Business Problems.

169.    As part of the Pattern of Racketeering Activity, and in furtherance of the New Patent Scheme, the RICO Defendants and RICO Co-Conspirators fraudulently registered patents for the following New Connectors in the name of Contexo:

|  |  | Country | Filing Date | Internal ID | Registration No. |
|---|---|---|---|---|---|
| a. | | New Light Weight Connector Patents | | | |
| | i. | Germany | 3/10/2008 | P1-70-PDE | DE 10 2008 013 443 |
| | ii. | Canada | 3/9/2009 | P1-70-PCA | CA 2657530 |
| | iii. | China | 3/10/2009 | P1-70-PCN | CN 200910127376.8 |
| | iv. | India | | P1-70-PIN | IN 552/CHE/2009 |
| b. | | XL-Connectors and Armored Connector Patent | | | |
| | i. | Europe | 2/22/2008 | P1-71-DEU | EU 000884457 |
| c. | | Combiwall with Tube Pile Connector Patents | | | |
| | i. | Germany | 2/25/2008 | P1-72-PDE | DE 10 2008 010 991.6 |
| | ii. | China | 2/25/2009 | P1-72-PCN | CN 200910004797.1 |
| | iii. | India | 2/25/2009 | P1-72-PIN | IN 405/CHE/2009 |
| | iv. | Eurasia | 2/24/2009 | P1-72-PEA | EA 200900216 |
| d. | | BPZi, BSTB, CFWO, W90 Patent | | | |
| | i. | Europe | 8/4/2008 | P1-75-DEU | EU 000981782 |
| e. | | Larssen-PZ and PZ-Sheet Pile Connector Patent | | | |

60

**CORRECTED COMPLAINT**

|   | i. | Europe | 12/9/2008 | P1-81-DEU | EU 001053532 |
|---|----|--------|-----------|-----------|--------------|
| f. | | UMHW-T-Mount Patent | | | |
|   | | Europe | 2/17/2009 | P1-84-DEU | EU 001090013 |
| g. | | New Connector Patent | | | |
|   | | Germany | 5/22/2009 | | DE 10 2009 022 413 A1 |
| h. | | New Connector Patent | | | |
|   | | Germany | 02/29/2009 | | DE 10 2008 011795 A1 |

170.   The License Fee Fraud.  As part of the Pattern of Racketeering Activity, Chang, Heindl, Farroni, Harzenmoser, Doering, and other RICO Defendants and RICO Co-Conspirators, devised a scheme to fraudulently obtain money from PilePro LLC and PilePro Sales by inducing Wendt, PilePro LLC, and PilePro Sales to send substantial sums of money to Contexo as "license fee payments" ("License Fee Scheme").  The RICO Defendants and RICO Co-Conspirators devised and executed the License Fee Scheme for the purpose of enriching themselves and acquiring capital to finance the Enterprise's operations.

171.   At the end of 2007, Wall-Profile had begun to accumulate substantial quantities of cash arising from the sale of Modular Connectors, WADIT, and related products and services ("WP Cash").  Chang, Heindl, Farroni, Harzenmoser, and Doering knew that Wall-Profile was obligated to remit the WP Cash to PilePro LLC and PilePro Sales.

172.   At the time they devised the License Fee Scheme, the RICO Defendants and RICO Co-Conspirators knew that Chang's role as CFO of both PilePro LLC and PilePro Sales would enable him to transfer, or direct the transfer of, funds from PilePro and PilePro Sales bank accounts in the United States to Wall-Profile bank accounts in Germany.  They also knew that Chang could direct Heindl and Doering to transfer funds from Wall-Profile's bank accounts in

**CORRECTED COMPLAINT**

Germany to Contexo's bank account in Switzerland.  They knew that Heindl's role as manager of Wall-Profile in Germany would enable him to conduct the funds transfers pursuant to instructions from Chang, Farroni, and Harzenmoser.  Moreover, they also knew that Farroni and Harzenmoser's role as directors enabled them to control any and all funds deposited into Contexo bank accounts.

173.   Chang directed the License Fee Scheme from the United States.

174.   In furtherance of the License Fee Scheme, the following representations were made to Wendt, PilePro LLC, and PilePro Sales beginning in December 2007 and continuing through at least April 2010:

a.     Chang and Heindl represented that transferring the WP Cash to Contexo was an important step in the process of accomplishing the Financial Objectives and Solving the Business Problems;

b.     Chang, Heindl, Farroni, and Harzenmoser represented that the license fee payments were lawful and legitimate;

c.     Chang, Heindl, Farroni and Harzenmoser represented that each company would properly and accurately account for the transactions in their respective books and records;

d.     Chang, Heindl, Farroni, and Harzenmoser represented that Wendt and PilePro LLC would continue to control the use and disposition of the WP Cash transferred to Contexo by virtue of Farroni's and Harzenmoser's legal and ethical obligations to follow Wendt's instructions;

62

**CORRECTED COMPLAINT**

e.      Chang, Heindl, Farroni, and Harzenmoser represented that the transfers should be characterized as licensing fees arising from Wall-Profile's production and sale of Modular Connectors using the Non-US Patent Rights belonging to PilePro LLC; and

f.      Chang, Heindl, Farroni, and Harzenmoser represented that the WP Cash would be used to, among other things, pay patent fees, attorney fees, and other expenses PilePro LLC and/or PilePro Sales would otherwise be required to pay.

g.      This Complaint sometimes refers to these representations as the "License Fee Representations."

175.    In furtherance of the License Fee Scheme, Chang, Heindl, Farroni, Harzenmoser, and Doering took the following actions between December 2007 and April 2010:

a.      In December 2007, Chang set the amounts and license fee rates to be transferred by Wall-Profile to Contexo.  Chang set the license fees and rates while directing the Enterprise's affairs from the United States;

b.      On December 20, 2007, Chang transmitted the license fee amounts and rates from the United States to Heindl in Germany via email;

c.      On or about the same date, Chang transmitted the license fee amounts and rates from the United States to Farroni and Harzenmoser in Switzerland via email and directed Farroni and Harzenmoser to collect the license fees from Wall-Profile;

d.      On or around the dates set forth below, Chang and Doering coordinated the transfer of money from PilePro LLC or PilePro Sales in the United States to Wall-Profile in Germany;

e.      On or about the dates set forth below, Chang directed Harzenmoser and/or Farroni to send Heindl and Doering demands for license fee payments to Wall-Profile;

63

**CORRECTED COMPLAINT**

f.      On or about the dates set forth below, Chang directed PilePro LLC or PilePro Sales to send money from its bank accounts in the United States to Wall-Profile's bank accounts in Germany; and

g.      On or about the dates set forth below, Chang directed Heindl and Doering to transfer money from Wall-Profile's bank accounts in Germany to Contexo's bank account in Switzerland ("License Fee Transfers").

h.      This Complaint sometimes refers to these actions as the "License Fee Predicate Acts."

176.    Chang, Heindl, Farroni, Harzenmoser, and Doering made the License Fee Representations and participated in the License Fee Predicate Acts in furtherance of the Enterprise.   Chang, Heindl, Farroni, Harzenmoser, and Doering knew the License Fee Representations were false and participated in the License Fee Predicate Acts with the intention of deceiving and defrauding Wendt, PilePro LLC, and PilePro Sales.

177.    Wendt, PilePro LLC, and PilePro Sales relied on the representations made by Chang, Heindl, Farroni, Harzenmoser, and Doering when authorizing the License Fee Predicate Acts.   Wendt and PilePro LLC did not know that the RICO Defendants and RICO Co-Conspirators formed and intended to use Contexo as a vehicle of fraud to divest PilePro LLC of substantial amounts of money and did not know the License Fee Transfers were intended to misappropriate money.   Wendt, PilePro LLC, and PilePro Sales reasonably believed that the License Fee Transfers were intended to achieve the Financial Objectives and solve the Business Problems, and that they were lawful and were being accurately recorded in each relevant company's books and records.

64

**CORRECTED COMPLAINT**

178.    In furtherance of the License Payment Scheme, the RICO Defendants and RICO

Co-Conspirators engaged in the following fraudulent License Fee Transfers:

|     | Date | Amount |
|-----|------|--------|
| a. | 3/31/2008 | €50,000.00 |
| b. | 4/11/2008 | €33,454.19 |
| c. | 4/16/2008 | €35,000.00 |
| d. | 4/16/2008 | €35,000.00 |
| e. | 4/21/2008 | €15,000.00 |
| f. | 4/21/2008 | €40,000.00 |
| g. | 5/21/2008 | €43,000.00 |
| h. | 6/27/2008 | €50,000.00 |
| i. | 6/27/2008 | €50,000.00 |
| j. | 7/10/2008 | €40,000.00 |
| k. | 7/10/2008 | €50,000.00 |
| l. | 7/10/2008 | €50,000.00 |
| m. | 7/14/2008 | €44,983.00 |
| n. | 7/21/2008 | €40,000.00 |
| o. | 7/23/2008 | €40,000.00 |
| p. | 7/23/2008 | €40,000.00 |
| q. | 7/28/2008 | €30,000.00 |
| r. | 7/28/2008 | €40,248.45 |
| s. | 8/1/2008 | €40,000.00 |
| t. | 8/1/2008 | €40,000.00 |

**CORRECTED COMPLAINT**

| | | |
|---|---|---|
| u. | 8/20/2008 | €50,000.00 |
| v. | 8/21/2008 | €50,000.00 |
| w. | 8/21/2008 | €50,000.00 |
| x. | 8/22/2008 | €41,050.00 |
| y. | 9/12/2008 | €311.00 |
| z. | 10/6/2008 | €20,000.00 |
| aa. | 10/9/2008 | €50,000.00 |
| bb. | 10/10/2008 | €18,246.68 |
| cc. | 10/10/2008 | €50,000.00 |
| dd. | 11/11/2008 | €20,000.00 |
| ee. | 11/24/2008 | €50,000.00 |
| ff. | 4/3/2009 | €32,000.00 |
| gg. | 4/28/2009 | €30,000.00 |
| hh. | 5/29/2009 | €15,023.87 |
| ii. | 8/7/2009 | €19,000.00 |
| jj. | 12/2/2009 | €50,000.00 |
| kk. | 12/4/2009 | €25,958.04 |
| ll. | 12/22/2009 | €12,269.08 |
| mm. | 12/22/2009 | €40,000.00 |
| nn. | 2/25/2010 | €10,000.00 |
| oo. | 3/30/2010 | €20,000.00 |
| pp. | 4/21/2010 | €37,281.70 |

66

179.   <u>The Contexo Transfer Fraud</u>.  As part of the Pattern of Racketeering Activity, the RICO Defendants and RICO Co-Conspirators devised a scheme to conceal the Pattern of Racketeering Activity by lulling Wendt, PilePro LLC, and PilePro Sales into believing that creating Contexo, and transferring substantial sums of money to it, was part of the Reorganization Plan to achieve the Financial Objectives and solve the Business Problems ("Contexo Transfer Scheme").

180.   Chang devised and directed the Contexo Transfer Scheme from the United States beginning from December 2007 and continuing through August 2008.

181.   In furtherance of the Contexo Transfer Scheme, the following representations were made to Wendt and PilePro LLC between January and August 2008:

a.   Chang, Heindl, Farroni, and Harzenmoser represented that Contexo would, as contemplated by the Reorganization Plan, accumulate substantial sums of money in its Swiss bank accounts as a result of the License Fee Payments and other transfers of funds from PilePro LLC, PilePro Sales, and Wall-Profile ;

b.   Chang and Heindl represented that transferring some of the funds received by Contexo in Switzerland to PilePro LLC in the United States would help accomplish the Financial Objectives and solve the Business Problems;

c.   Chang, Heindl, Farroni, and Harzenmoser represented that the transfers from Contexo to PilePro LLC should be characterized as a down payment toward the purchase of a few, but not all, Non-US Patent Rights;

d.   Chang, Heindl, Farroni, and Harzenmoser reaffirmed that Wendt and PilePro LLC would continue to control Contexo;

**CORRECTED COMPLAINT**

e.      Chang, Heindl, Farroni, and Harzenmoser represented that Contexo should make the transfers even though Wendt and PilePro LLC had not reached an agreement to transfer the Non-US Patent Rights to Contexo and had not executed the Assignment Contract; and

f.      Chang, Heindl, Farroni, and Harzenmoser represented that Contexo should transfer the money to PilePro LLC because the funds held by Contexo belonged to PilePro LLC.

g.      This Complaint sometimes refers to these representations as the "Contexo Transfer Representations."

182.   As part of the Pattern of Racketeering Activity, the RICO Defendants and RICO Co-Conspirators took the following actions:

a.      Near the dates set forth below, Chang transferred substantial sums of money from PilePro LLC's and PilePro Sale's bank accounts in the United States to Wall-Profile's bank accounts in Germany;

b.      Near the dates set below, Chang directed Heindl and/or Doering to transfer substantial sums of money from Wall-Profile's bank account in Germany to Contexo's bank account in Switzerland;

c.      Near the dates and in the amounts set forth below, Chang directed Farroni and Harzenmoser to transfer the following sums of money set forth below from Contexo's bank accounts in Switzerland to PilePro LLC's bank account in the United States.

**CORRECTED COMPLAINT**

      d.      On or about the dates and in the amounts set forth below, Farroni and/or Harzenmoser transferred the following sums of money from Contexo's bank account in Switzerland to PilePro LLC's bank account in the United States:

| Date | Amount |
|------|--------|
| i.     January 11, 2008 | $779,975.00 USD |
| ii.    July 31, 2008 | $600,000.00 USD |
| iii.   August 28, 2008 | $500,000.00 USD |

      e.      This Complaint sometimes refers to these acts collectively as the "Contexo Transfer Acts."

183.    Chang, Heindl, Farroni, and Harzenmoser made the Contexo Transfer Representations and participated in the Contexo Transfer Acts in furtherance of the Enterprise. Chang, Heindl, Farroni, and Harzenmoser knew the Contexo Transfer Representations were false at the time they were made and participated in the Contexo Transfer Acts with the intention of deceiving and defrauding Wendt, PilePro LLC, and PilePro Sales.  In particular, Chang, Heindl, Farroni, and Harzenmoser knew that the Contexo Transfers were not intended to achieve the Financial Objectives or solve Business Problems.  They knew, but did not disclose, that the Contexo Transfers were, instead, being undertaken to conceal the Pattern of Racketeering Activity and the objectives and purposes of the Enterprise.

184.    At the time of each Contexo Transfer, Chang, Heindl, Farroni, and Harzenmoser knew that PilePro LLC's Non-US Patent Rights were worth many times more than the USD $1,879,975 transferred by Contexo to PilePro LLC during 2008.

185.    Wendt, PilePro LLC, and PilePro Sales relied on the representations made by Chang, Heindl, Farroni, and Harzenmoser when agreeing to and authorizing the Contexo

**CORRECTED COMPLAINT**

Transfers.  Wendt and PilePro LLC did not know that the RICO Defendants and RICO Co-Conspirators formed and intended to use Contexo as a vehicle of fraud to divest PilePro LLC of the Non-US Patents and also of substantial amounts of money.  In particular, Wendt and PilePro LLC did not know that the Contexo Transfers were intended to lull them into believing that the actions of the RICO Defendants and RICO Co-Conspirators were being undertaken with the intent to accomplish the Financial Objectives and solve the Business Problems.  Wendt and PilePro LLC reasonably believed the Contexo Transfer Representations.

186.    <u>The Assignment Fraud</u>.  As part of the Pattern of Racketeering Activity, the RICO Defendants and RICO Co-Conspirators devised a scheme to acquire the Non-US Patents from PilePro LLC by fraud ("Assignment Scheme").  The RICO Defendants and RICO Co-Conspirators devised and executed the Assignment Scheme with the intent to induce government patent offices in Germany, the European Community, and other countries to change the registered owner of the Non-US Patents from PilePro LLC to Contexo and thereby deprive PilePro LLC and PilePro Sales of any right to produce, market, or sell Modular Connectors in the Domestic and International Connector Markets.

187.    In early 2010, Wendt discovered that Heindl was guilty of financial irregularities and other misconduct at PilePro Sales, Wall-Profile, and Contexo.  As a consequence, Wendt verbally terminated Heindl from PilePro Sales and Wall-Profile on April 17, 2010.  PilePro Sales and Wall-Profile, thereafter, formally notified Heindl of his termination through a shareholders' resolution enacted on April 22, 2010.

188.    To prevent Heindl's continued defalcation, Wendt removed Heindl's signature authority on Wall-Profile's bank accounts.  Wendt instructed Farroni and Harzenmoser to stop

**CORRECTED COMPLAINT**

disbursing money to Heindl from Contexo's bank accounts.  As an added precaution, Wendt also stopped the License Fee Transfers from Wall-Profile to Contexo.

189.    On April 22, 2010, in an email, Heindl vowed that Wendt's actions "will have consequences in our relationship."  At that time, the Non-US Patent Rights were registered to PilePro LLC in Germany, the European Community, and all other countries, and Wendt and PilePro LLC had refused to execute or agree to the Assignment Contract.

190.    After Heindl's termination, Chang, Heindl, Weigel, Farroni, and Harzenmoser devised and executed the Assignment Scheme.

191.    On April 22, 2010, in furtherance of the Assignment Scheme, Weigel began the process of illegally – an in a brazen theft -- transferring the Non-US Patent Rights without Wendt's or PilePro LLC's knowledge or consent.

a.      Weigel initiated the transfer of some Non-US Patent Rights from PilePro LLC to Contexo by submitting a letter to the German Patent Office asking it to register the patents in Contexo's name.  Weigel initiated the patent registration transfers without a contract or other writing establishing that PilePro LLC had actually assigned the Non-US Patent Rights to Contexo.  Weigel represented to the German Patent Office that the transfer was valid based solely on his representation that he was the patent attorney for both PilePro LLC and Contexo.

b.      Weigel fraudulently initiated the illegal transfer using legal authority granted to patent attorneys under German law.

c.      At the time Weigel initiated the transfer, he knew that Wendt and PilePro LLC had not authorized the transfer and that they did not know he had initiated the illegal

**CORRECTED COMPLAINT**

transfer.  To conceal the Assignment Scheme, Weigel did not inform Wendt or PilePro LLC of the transfer request.

192.     On April 29, 2010, in furtherance of the Assignment Scheme, Chang and Weigel bought additional time for the RICO Defendants and RICO Co-Conspirators to achieve the Enterprise's objectives by deceiving Wendt and Williams into believing that Weigel could be trusted to act solely for the benefit of PilePro LLC and into retaining him as the patent attorney for PilePro LLC.  In order to buy additional time to complete the Assignment Scheme, Chang and Weigel made the following representations:

   a.     Wendt, Williams, and Chang met with Weigel in his law office in Munich, Germany on April 29, 2010 to inform him that PilePro LLC, PilePro Sales, and Wall-Profile were terminating his legal services.  Wendt and Williams explained that they had decided to terminate his legal services because they were concerned that he now had a conflict of interest in light of Heindl's termination and Weigel's close relationship to Heindl.  Wendt and Williams also asked Weigel to deliver his patent and legal files to them so they could retain new counsel.  In connection with the meeting, Wendt, Williams, and Chang traveled from the United States to Munich, Germany.

   b.     Weigel responded with the following affirmative misrepresentations made with the intent to protect and maintain his critical role in the Enterprise as patent counsel with power of attorney to act on behalf of PilePro LLC:

      i.     Weigel told Wendt and Williams that he was a German patent attorney and that he knew he owed PilePro LLC a fiduciary duty of loyalty;

      ii.    Weigel told Wendt and Williams that PilePro LLC was his client, not Heindl and that his duty and loyalty ran to PilePro LLC, not to Heindl;

72

**CORRECTED COMPLAINT**

iii.     Weigel told Wendt and Williams that he desired to continue representing PilePro LLC and its related companies;

iv.     Weigel told Wendt and Williams that he had a valuable "institutional memory" that no other patent attorney could acquire quickly enough to meet PilePro LLC's pending patent needs;

v.     Weigel promised Wendt and Williams that he would fulfill, honor, and faithfully perform his duties of loyalty to PilePro LLC, and its related companies, even though Heindl was no longer affiliated with them; and

vi.     Weigel promised Wendt and Williams that he would not work for, or share any PilePro LLC confidences or intellectual property with, Heindl.

vii.     This Complaint sometimes refers to these representations as the "Weigel Conflict Representations."

c.     When making the Weigel Conflict Representations, Weigel affirmatively concealed material facts from Wendt and Williams with the intent to prevent the Assignment Scheme from being discovered.  Among other facts, Weigel concealed the following:

i.     Weigel did not inform Wendt or Williams that he had for a period of years been working with Chang, Heindl, Farroni, and Harzenmoser in ways that were adverse to PilePro LLC.  Among other things, Weigel concealed his participation in the New Patent Scheme;

ii.     Weigel did not inform Wendt or Williams that he was working with Heindl, Farroni, and Harzenmoser to transfer the Non-US Patents to Contexo;

**CORRECTED COMPLAINT**

iii.    Weigel did not inform Wendt or Williams that he intended to stop representing PilePro LLC and continue representing Heindl and Contexo adversely to the interests of Wendt and PilePro LLC;

iv.    Weigel did not inform Wendt or Williams that he intended to use his "institutional memory" to benefit the RICO Defendants and RICO Co-Conspirators, not PilePro LLC or Wendt; and

v.    Weigel did not inform Wendt or Williams that he was benefiting financially from the work he was performing for the RICO Defendants and RICO Co-Conspirators.

vi.    This Complaint sometimes refers to these omissions as the "Weigel Conflict Omissions."

d.    In furtherance of the Assignment Scheme, Chang had travelled with Wendt and Williams from the United States to Munich, Germany to ensure that Weigel remained PilePro LLC's patent attorney and that his power of attorney to act on PilePro LLC's behalf was not revoked.  During the meeting, Chang agreed with the Weigel Conflict Representations and also strongly recommended that Wendt and Williams allow Weigel to remain as PilePro LLC's patent attorney.

e.    Weigel made, and Chang supported, the Weigel Conflict Representations and failed to disclose the Weigel Conflict Omissions in furtherance of the Enterprise. Chang and Weigel knew the Weigel Conflict Representations were false at the time they were made.  Moreover, Chang and Weigel also failed to disclose the Weigel Conflict Omissions with the intent to deceive Wendt and Williams into retaining Weigel as the patent attorney for PilePro LLC.

74

**CORRECTED COMPLAINT**

f.     Wendt and Williams relied on the Weigel Conflict Representations and the lack of knowledge concerning the Weigel Conflict Omissions.  On April 29, 2010, Wendt and Williams reasonably believed that the Weigel Conflict Representations were true and had no knowledge of the Weigel Conflict Omissions.  As a result, Wendt and Williams reasonably allowed Weigel to continue as PilePro LLC's patent attorney and retain his power of attorney to act on behalf of PilePro LLC.

193.    On May 11-12, 2010, in furtherance of the Assignment Scheme, Chang, Farroni, Harzenmoser, and Doering backdated documents with the fraudulent intent to make it appear as though PilePro LLC had assigned the Existing Non-US Patents to Contexo in 2007.   In connection with their effort to create a fraudulent paper trail, Chang, Farroni, Harzenmoser, and Doering communicated via email between the United States and Germany and Switzerland.

194.    Between May 21 and May 25, 2010, in furtherance of the Assignment Scheme, Weigel and Chang affirmatively concealed the Enterprise's activity from PilePro LLC, Wendt, and Williams.  During that time period, Weigel in Germany and Chang in the United States worked with Wendt and Williams in the United States to draft a formal notice that could be sent by PilePro LLC to third parties.  The notice was intended to inform the third parties that PilePro LLC owned valid Modular Connector patents in the United States, the European Union, the Eurasian counties and the Asian countries.  At the time, neither Chang nor Weigel disclosed to Wendt or Williams that Weigel had already asked the German Patent Office to transfer some Non-US Patent Rights from PilePro LLC to Contexo and failed to disclose that they were working with the other RICO Defendants and RICO Co-Conspirators to transfer all Non-US Patent Rights to Contexo.

**CORRECTED COMPLAINT**

195.    At some point between May 12, 2010 and June 2, 2010, in furtherance of the Assignment Scheme, Heindl, Weigel, and Farroni created an assignment that falsely and fraudulently represented that PilePro LLC had transferred all Non-US Patent Rights to Contexo ("Backdated Assignment").  To create the appearance of legitimacy, Heindl, Weigel, and Farroni backdated the Assignment to March 25, 2010, a date before Heindl's termination from PilePro Sales.  To further the appearance of legitimacy, Heindl executed the Backdated Assignment using the title "CEO – PilePro LLC."  At the time, they created the Backdated Assignment, Heindl, Weigel, and Farroni knew that Heindl did not have authority to transfer the Non-US Patent Rights from PilePro LLC to Contexo.  They also knew that PilePro LLC did not know about the Backdated Assignment and had not consented to assigning the Non-US Patent Rights to Contexo.

196.    On June 2, 2010, in furtherance of the Assignment Scheme, Weigel, while still acting in the capacity of PilePro LLC's patent attorney, mailed the Backdated Assignment to patent offices and/or law firms in other countries such as England, Turkey, Italy, the Netherlands, France, and Luxembourg.  In his communications with the patent offices and law firms, Weigel falsely represented that PilePro LLC had assigned the Non-US Patent Rights to Contexo and instructed the recipients to transfer the registration of those rights into Contexo's name.  Weigel's instruction to the patent offices and law firms was undertaken without the knowledge or consent of Wendt or PilePro LLC.

197.    On June 4, 2010, in furtherance of the Assignment Scheme, Weigel, while still purporting to act in the capacity as PilePro LLC's patent attorney, instructed the Office of Harmonization in the Internal Market, to transfer all community patent designs from PilePro

76

**CORRECTED COMPLAINT**

LLC to Contexo.  Weigel instructed the Office of Harmonization to transfer the community design rights to Contexo without the knowledge or consent of either Wendt or PilePro LLC.

198.   Relying on the Backdated Assignment and the instructions received from Weigel, who represented himself as PilePro LLC's patent attorney, the German Patent Office, Office of Harmonization in the Internal Market, European Patent Office, and the patent offices of other countries transferred ownership of the Non-US Patent Rights from PilePro LLC to Contexo.

199.   On June 17, 2010, in furtherance of the Assignment Scheme, Farroni offered to transfer one of PilePro LLC's most valuable patents ("Beam Patent") to ArcelorMittal, the world's largest steel company.  The Beam Patent was among the Non-US Patent Rights fraudulently transferred to Contexo in the Backdated Assignment.  At the time of Farroni's offer, PilePro LLC and ArcelorMittal were litigating the validity of the Beam Patent before the German Patent Office.  Invalidating or acquiring the Beam Patent was very important to ArcelorMittal because it had used connectors that infringed the Beam Patent at the Jade-Weser Port project near Wilhelmshaven, Germany, thereby potentially subjecting ArcelorMittal to substantial damages.

200.   On June 23, 2010, unbeknownst to the PilePro Plaintiffs and in furtherance of the Assignment Scheme, Heindl, Farroni, Harzenmoser, and Weigel caused Contexo to file a petition seeking to enjoin a German steel mill from manufacturing Modular Connectors for PilePro Sales and Wall-Profile ("Injunction Proceedings").  If they had been successful, PilePro Sales and Wall-Profile would have been unable to satisfy a large order from a customer.  Contexo based the Injunction Proceedings on a production order Heindl had placed with the steel mill before he was terminated from PilePro Sales and Wall-Profile and before making the alleged assignment of PilePro LLC's patent rights to Contexo.  Even though he was still acting as PilePro LLC's patent

77

**CORRECTED COMPLAINT**

attorney, Weigel assisted Heindl, Farroni, Harzenmoser, and Contexo in preparing the petition for injunctive relief.

201.    On the same day, in furtherance of the Enterprise's purposes, Weigel, while still acting in the capacity of PilePro LLC's patent attorney, instructed European Patent Office to transfer all Non-US Patent Rights from PilePro LLC to Contexo.   Weigel instructed the European Community Patent Office to transfer Non-US Patent Rights to Contexo without the knowledge or consent of either Wendt or PilePro LLC.

202.    On the same day, in furtherance of the Enterprise's purposes, Weigel revealed for the first time in an email that, unbeknownst to PilePro LLC and Wendt, he had already transferred the Beam Patent from PilePro LLC to Contexo.

203.    On June 24, 2010, in furtherance of the Enterprise's purposes, Weigel and Heindl appeared on behalf of PilePro LLC at a very important hearing in front of the German Patent and Trademark Office.  ("Beam Patent Hearing").  The Beam Patent Hearing related to the PilePro LLC/ArcelorMittal Beam Patent contest, the same patent Farroni had offered to transfer to ArcelorMittal on June 17, 2010.  During the hearing, Weigel told the tribunal, among other things, that he had transferred the Beam Patent from PilePro LLC to Contexo.

204.    On that same day, in furtherance of the Enterprise's purposes, Weigel, while still acting in the capacity of PilePro LLC's patent attorney, interfered with PilePro LLC's effort to replace him and revoke his power of attorney before the German Patent and Trademark Office in light of his revelations during the Beam Patent contest hearing.  Weigel asserted that PilePro LLC was no longer able to grant or revoke powers of attorney for the Beam Patent, since the Beam Patent had been transferred to Contexo on the same day.

**CORRECTED COMPLAINT**

205.    On June 28, 2010, in furtherance of the Enterprise, Weigel, while still acting in the capacity of PilePro LLC's patent attorney, instructed a variety of other jurisdictions to transfer the Non-US Patent Rights from PilePro LLC to Contexo, including Brazil, Canada, China, Eurasia, Japan, Mexico, and South Korea.  Weigel instructed the jurisdictions to transfer the Non-US Patent Rights to Contexo without the knowledge or consent of either Wendt or PilePro LLC.

206.    On July 4, 2010, in furtherance of the Enterprise and with the misappropriation of PilePro LLC's valuable patents complete, Weigel withdrew as the patent attorney for PilePro LLC.  He did not withdraw until he had completed transferring all of the Non-US Patent Rights from PilePro LLC to Contexo in jurisdictions around the world without the knowledge or consent of either Wendt or PilePro LLC.

**The Money Diversion Scheme**

207.    In addition to the Business Usurpation Scheme, from at least October 2006 through and including May, 2011, the RICO Defendants and RICO Co-Conspirators knowingly and intentionally devised, and participated in, a pervasive, parasitical scheme and artifice to directly defraud PilePro of large sums of money ("Money Diversion Scheme").  The Money Diversion Scheme included engaging in fraudulent financial transactions in furtherance of the Enterprise from October 2006 forward as well as affirmative actions to conceal from PilePro LLC and Wendt fraudulent transactions carried out by Heindl, Doering, and Maier before October 2006.

208.    To effectuate the fraud scheme, the RICO Defendants and RICO Co-Conspirators engaged in the following acts:

**CORRECTED COMPLAINT**

a.      The RICO Defendants and RICO Co-Conspirators would, by telephone, email, or some other form of communication in interstate or foreign commerce, ask PilePro LLC or PilePro Sales either to (a) transfer a sum of money from their bank accounts in the United States to another bank account in the United States or in another country or (b) authorize the payment of PilePro LLC or PilePro Sales funds to a third-party.

b.      The RICO Defendants and RICO Co-Conspirators would induce PilePro LLC and/or PilePro Sales to transfer the requested money, or authorize the requested disbursement, by falsely representing that all of the funds were needed to pay specifically identified business expenses.

c.      The RICO Defendants and RICO Co-Conspirators knew, at the time of the request, that the funds would not be used completely for the purpose represented. Instead, they knew that at least a portion of the funds would be diverted to other, non-business purposes; used to enrich the RICO Defendants, the RICO Co-Conspirators, and other individuals and entities affiliated with the Enterprise; and to further the objectives of the Enterprise.

d.      The RICO Defendants and RICO Co-Conspirators gained control over the funds once the wire transfers or other forms of disbursements were completed.

e.      After gaining control of PilePro LLC's or PilePro Sales's funds, the RICO Defendants and RICO Co-Conspirators used at least a portion of the transferred funds to enrich themselves or to further the objectives of the Enterprise.

f.      The RICO Defendants and RICO Co-Conspirators concealed the true nature and use of the requested funds, and deceived PilePro LLC and PilePro Sales, by

80

causing Heindl, Doering, Chang, and Maier to, among other things, (a) omit the transactions from PilePro LLC's, PilePro Sales', or Wall-Profile's books, records, and financial reports; (b) record the transactions in a way that misrepresented the true nature and use of the funds; and (c) create false supporting documentation substantiating the use of the funds.

209.    The Money Diversion Scheme would have continued indefinitely and ceased only because it was discovered and disrupted in connection with PilePro LLC's decisions to terminate Chang and Heindl.

210.    In furtherance of the Pattern of Racketeering Activity and the Money Diversion Scheme, Chang, Heindl, and Doering caused PilePro LLC and PilePro Sales to transfer the following funds from their bank accounts in the United States to Wall-Profile's bank accounts in Germany to enable the Money Diversion Scheme:

|    | Date | Amount |
|----|------|--------|
| a. | 11/19/2007 | $90,564.78 |
| b. | 12/05/2007 | $112,478.04 |
| c. | 04/16/2008 | $282,358.13 |
| d. | 07/14/2008 | $171,863.16 |
| e. | 08/15/2008 | $72,524.79 |
| f. | 08/15/2008 | $141,698.18 |
| g. | 08/19/2008 | $74,599.32 |
| h. | 09/10/2008 | $173,525.08 |
| i. | 10/07/2008 | $251,293.51 |
| j. | 03/04/2009 | $198,294.45 |

81

**CORRECTED COMPLAINT**

|     |            |              |
| --- | ---------- | ------------ |
| k.  | 05/08/2009 | $88,455.07   |
| l.  | 06/02/2009 | $465,768.63  |
| m.  | 08/24/2009 | $128,612.63  |
| n.  | 09/08/2009 | $64,995.18   |
| o.  | 09/17/2009 | $140,189.80  |

211.    In furtherance of the Pattern of Racketeering Activity and the Money Diversion Scheme, Heindl and Doering fraudulently disbursed the following funds from Wall-Profile's bank accounts for Heindl's personal benefit:

|     | Date       | Amount     |
| --- | ---------- | ---------- |
| a.  | 11/22/2007 | €3,000.00  |
| b.  | 11/30/2007 | €1,500.00  |
| c.  | 12/05/2007 | €1,500.00  |
| d.  | 05/15/2008 | €14,000.00 |
| e.  | 07/12/2008 | €2,000.00  |
| f.  | 07/15/2008 | €2,000.00  |
| g.  | 07/18/2008 | €1,000.00  |
| h.  | 07/28/2008 | €2,000.00  |
| i.  | 08/18/2008 | €1,000.00  |
| j.  | 08/22/2008 | €2,000.00  |
| k.  | 08/28/2008 | €2,000.00  |
| l.  | 09/04/2008 | €1,010.00  |
| m.  | 09/09/2008 | €1,000.00  |
| n.  | 09/14/2008 | €2,000.00  |

82

**CORRECTED COMPLAINT**

o.     09/17/2008                    €1,500.00

p.     09/19/2008                    €1,500.00

q.     09/23/2008                    €1,000.00

r.     10/02/2008                    €1,500.00

s.     10/02/2008                    €2,000.00

t.     10/02/2008                    €8,000.00

u.     10/10/2008                    €5,000.00

v.     10/11/2008                    €2,000.00

w.     10/20/2008                    €153.28

x.     10/20/2008                    €1,000.00

y.     10/22/2008                    €1,000.00

z.     10/22/2008                    €2,000.00

aa.    10/28/2008                    €500.00

bb.    10/29/2008                    €505.00

cc.    12/05/2008                    €236.16

dd.    12/08/2008                    €2,000.00

ee.    12/11/2008                    €5,000.00

ff.    12/18/2008                    €1,000.00

gg.    12/22/2008                    €2,000.00

hh.    12/29/2008                    €20,000.00

ii.    03/11/2009                    €500.00

jj.    03/13/2009                    €5,000.00

kk.    03/17/2009                    €1,000.00

**CORRECTED COMPLAINT**

| | | |
|---|---|---|
| ll. | 03/19/2009 | €1,500.00 |
| mm. | 04/02/2009 | €505.00 |
| nn. | 04/03/2009 | €1,500.00 |
| oo. | 04/06/2009 | €13,000.00 |
| pp. | 04/09/2009 | €500.00 |
| qq. | 04/09/2009 | €1,500.00 |
| rr. | 04/09/2009 | €2,000.00 |
| ss. | 04/15/2009 | €505.00 |
| tt. | 04/17/2009 | €1,500.00 |
| uu. | 04/22/2009 | €1,010.00 |
| vv. | 04/22/2009 | €1,010.00 |
| ww. | 04/22/2009 | €5,000.00 |
| xx. | 04/28/2009 | €1,000.00 |
| yy. | 04/29/2009 | €2,000.00 |
| zz. | 05/04/2009 | €1,500.00 |
| aaa. | 05/12/2009 | €1,010.00 |
| bbb. | 05/12/2009 | €1,500.00 |
| ccc. | 05/18/2009 | €1,000.00 |
| ddd. | 05/22/2009 | €153.00 |
| eee. | 05/22/2009 | €2,000.00 |
| fff. | 05/25/2009 | €1,000.00 |
| ggg. | 05/26/2009 | €150.44 |
| hhh. | 05/26/2009 | €200.00 |

**CORRECTED COMPLAINT**

| iii. | 05/29/2009 | €1,000.00 |
| jjj. | 06/03/2009 | €757.50 |
| kkk. | 06/05/2009 | €4,500.00 |
| lll. | 06/22/2009 | €500.00 |
| mmm. | 09/11/2009 | €505.98 |
| nnn. | 09/14/2009 | €1,010.00 |
| ooo. | 09/14/2009 | €1,010.00 |
| ppp. | 09/21/2009 | €2,000.00 |
| qqq. | 09/29/2009 | €2,000.00 |
| rrr. | 10/10/2009 | €505.98 |
| sss. | 10/12/2009 | €405.98 |
| ttt. | 10/13/2009 | €15,000.00 |
| uuu. | 10/13/2009 | €505.98 |
| vvv. | 10/16/2009 | €1,000.00 |
| www. | 11/02/2009 | €144.07 |
| xxx. | 11/10/2009 | €8,500.00 |
| yyy. | 12/05/2009 | €500.00 |
| zzz. | 12/07/2009 | €500.00 |
| aaaa. | 12/08/2009 | €528.96 |

## RICO INJURIES TO BUSINESS AND PROPERTY

212.    As a result of the RICO Defendants and RICO Co-Conspirators violations of 18 U.S.C. § 1962(c) and (d), PilePro LLC, PilePro Sales, and Wendt have been injured in their business and property in an amount in excess of $75,000.  The RICO Plaintiffs did not discover

85

the RICO injuries to their businesses or property until after June 24, 2010, when the RICO Defendants and RICO Co-Conspirators appeared at the Beam Patent Proceedings and June 25, 2010, when they served their papers in the Injunction Proceedings.  Before these dates, the PilePro Plaintiffs had no knowledge of the Pattern of Racketeering Activity or the injuries to their business and property.  The PilePro Plaintiffs continue to discover additional harm to their business and property arising in multiple jurisdictions from the actions undertaken by the RICO Defendants and RICO Co-Conspirators.

213.    The business and property injuries suffered by PilePro LLC, PilePro Sales, and Wendt have included, but are not limited to, the following:

214.    PilePro LLC has been injured in its business and property as a result of being fraudulently divested of the Existing Non-US Patent Rights and the New Connector Patent Rights.  In addition, PilePro LLC has been defrauded of money and other property in excess of $75,000.

215.    PilePro Sales has been injured in its business and property as a result of being defrauded of money and other property in an amount in excess of $75,000.

216.    The PilePro Plaintiffs have been injured in their business and property as a result of the RICO Defendants and RICO Co-Conspirators selling products to JD Fields & Company. ("JD Fields").   JD Fields supplies steel sheet piling and connectors to the Domestic and International Markets.  Among other products, Steelwall GmbH is currently selling Modular Connectors and Steelant to JD Fields in the United States.  As a result of the RICO Defendants' and RICO Co-Conspirators' selling Modular Connectors and Steelant to JD Fields in the United States, JD Fields is no longer buying Modular Connectors or WADIT from PilePro Sales.

**CORRECTED COMPLAINT**

217.    The PilePro Plaintiffs have been injured in their business and property as a result of the RICO Defendants and RICO Co-Conspirators selling products to Skyline Steel, LLC. ("Skyline Steel").   Skyline Steel supplies steel sheet piling, connectors, and sealants to the Domestic and International Markets.   Among other products, Steelwall GmbH is currently importing Steelant into the United States through Eastlink Capital and then selling it to Skyline Steel.  Steelant is the same chemical compound manufactured by the same company as WADIT. As a result of the RICO Defendants and RICO Co-Conspirators selling Steelant to Skyline Steel in the United States, Skyline Steel is no longer buying WADIT from PilePro Sales.

218.    The PilePro Plaintiffs were injured in their business and property as a result of the RICO Defendants and RICO Co-Conspirators effort to interfere with the PilePro Plaintiffs' ability to track their then-existing inventory of Modular Connectors and prevent them from filling new orders with Modular Connectors in stock at their warehouse locations.  In the months preceding their efforts to stop the PilePro Plaintiffs from producing new Modular Connectors, Chang, in furtherance of the Enterprise, had altered inventory records and depleted the inventory of connectors.   As a result during 2010, PilePro Sales had no reliable means of knowing what inventory was available in stock to fill customer orders.

219.    The PilePro Plaintiffs were injured in their business and property as a result of the RICO Defendants' and RICO Co-Conspirators' effort to cause the termination of PilePro Sales' line of credit with Bank of America.  In the months preceding their efforts to stop the PilePro Plaintiffs from producing new Modular Connectors, Chang, in furtherance of the Enterprise, stopped preparing financial reports or keeping accurate financial records relating to PilePro LLC and PilePro Sales.  At the time, Chang, as CFO of the PilePro group of companies, knew Bank of America expected to receive annual financial reports as a condition of continuing the line of

**CORRECTED COMPLAINT**

credit.  The loss of PilePro Sale's line of credit harmed the PilePro Plaintiffs by restricting their ability to finance, and increasing the costs relating to, the production of Modular Connectors to meet customer demands.

220.    The PilePro Plaintiffs have been injured in their business and property as a result of Steelwall GmbH conspiring with ThyssenKrupp Bautechnik ("ThyssenKrupp") to palm off Modular Connectors manufactured by Steelwall as Modular Connectors manufactured by PilePro Sales/Wall-Profile.  ThyssenKrupp is a large construction company that provides "all-inclusive service" relating to the sale and installation of steel sheet pile, including Modular Connectors. As of the date this Complaint was filed, the ThyssenKrupp catalog available on its website advertises the sale of PilePro Sales/Wall-Profile Modular Connectors.  However, after taking orders ThyssenKrupp ships customers Modular Connectors manufactured by Steelwall GmbH using stolen designs and patents.  As a result of these actions, the PilePro Plaintiffs have lost Modular Connector sales.

221.    The PilePro Plaintiffs have been injured in their business and property as a result of the RICO Defendants and RICO Co-Conspirators entering into agreements with Welser Profile Austria, GmbH ("Welser") to produce Modular Connectors for the Enterprise using patents that were misappropriated by the RICO Defendants and RICO Co-Conspirators.  Despite being notified that the patents being used to produce Modular Connectors for Contexo and Steelwall GmbH are not legally and lawfully owned by them, Welser continues to produce Modular Connectors that enable the RICO Defendants and RICO Co-Conspirators to fraudulently compete with the PilePro Plaintiffs in the International and Domestic Markets.  As a result of these actions, the PilePro Plaintiffs have lost Modular Connector sales.

88

**CORRECTED COMPLAINT**

222.    The PilePro Plaintiffs have been injured in their business and property as a result of the RICO Defendants' and RICO Co-Conspirators' entering into agreements with Mannstaedt GmbH ("Mannstaedt") to produce Modular Connectors for the Enterprise using patents that were misappropriated by the RICO Defendants and RICO Co-Conspirators.  Mannstaedt is one of Europe's largest steel mills. Despite being notified that the patents being used to produce Modular Connectors for Contexo and Steelwall GmbH are not legally and lawfully owned by them, Mannstaedt continues to produce Modular Connectors that enable the RICO Defendants and RICO Co-Conspirators to fraudulently compete with the PilePro Plaintiffs in the International and Domestic Markets.  As a result of these actions, the PilePro Plaintiffs have lost Modular Connector sales.

223.    The PilePro Plaintiffs have been injured in their business and property as a result of the RICO Defendants and RICO Co-Conspirators selling products to METO ("METO"). METO is a Russian company that entered into a written contract with PilePro Sales to supply Modular Connectors to the Russian steel sheet pile market.  The RICO Defendants and RICO Co-Conspirators wrongfully and unlawfully induced METO to breach its agreement and to purchase Modular Connectors from Steelwall GmbH instead of from PilePro Sales.  As a result, METO has purchased, and is currently purchasing, Modular Connectors from Steelwall GmbH.  . As a result of the RICO Defendants' and RICO Co-Conspirators' selling Modular Connectors and Steelant to METO, METO is no longer buying Modular Connectors or WADIT from PilePro Sales.

224.    The RICO Defendants' and RICO Co-Conspirators' pervasive Pattern of Racketeering Activity has had lasting and irreparable adverse effects on the PilePro Plaintiffs. The RICO Defendants' and RICO Co-Conspirators' false statements and falsified documents

89

**CORRECTED COMPLAINT**

have been relied on by courts in Germany and Switzerland, by patent offices in countries around the world, and by the PilePro Plaintiffs' customers, vendors, and producers.  As a consequence of the RICO Defendants' and RICO Co-Conspirators' conduct, the PilePro Plaintiffs have been forced to expend substantial sums of money in attorneys' fees and costs in efforts to regain their Non-US Patent Rights and to disprove and defend against the false statements, documents, and claims asserted by the RICO Defendants and RICO Co-Conspirators in various jurisdictions.

**COUNT ONE**
(RICO Violation of 18 U.S.C. § 1962(c))

225.    The PilePro Plaintiffs repeat and reallege by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

226.    From October 2006 through the present, the RICO Defendants and each of them willfully, knowingly, and with the intent to defraud, engaged in a Pattern of Racketeering Activity and obtained money and property from PilePro LLC, PilePro Sales, and Wendt by means of false pretenses, false representations, material omissions, and other fraudulent means.

227.    On or about the dates specifically set forth in the preceding Paragraphs of this Complaint, and on other dates in furtherance of the transactions described in the preceding Paragraphs, the RICO Defendants caused to be transmitted by wire communication in interstate and foreign commerce information relating to the actions constituting part of the Pattern of Racketeering Activity for the purpose of executing, attempting to execute, and concealing the Pattern of Racketeering Activity, in violation of 18 U.S.C. § 1343.

228.    On or about the dates specifically set forth in the preceding Paragraphs of this Complaint, and on other dates in furtherance of the transactions described in the preceding Paragraphs, the RICO Defendants travelled and caused to travel in interstate and foreign

90

**CORRECTED COMPLAINT**

commerce individuals for the purpose of executing, attempting to execute, and concealing the Pattern of Racketeering Activity, in violation of 18 U.S.C. § 2314.

229.    On or about the dates specifically set forth in the preceding Paragraphs of this Complaint, and on other dates in furtherance of the transactions described in the preceding Paragraphs, the RICO Defendants did knowingly and intentionally engage in, attempt to engage in, and cause others to engage in, financial transactions involving the proceeds of unlawful activity, including wire fraud and the interstate transportation of individuals, knowing that the funds involved in such financial transactions represented the proceeds of some form of unlawful activity, with the intent to promote the carrying on of the specified unlawful activity and to conceal or disguise the nature, ownership, or control of the proceeds of the unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and 1956(a)(2)(A) and (B)(i).

230.    On or about the dates specifically set forth in the preceding Paragraphs of this Complaint, and on other dates in furtherance of the transactions described in the preceding Paragraphs, the RICO Defendants did knowingly and intentionally engage in, attempt to engage in, and cause others to engage in monetary transactions, as that term is described in 18 U.S.C. § 1957(f)(1), in criminally derived property that was of a value greater than $10,000, including wire fraud and the interstate transportation of individuals, by or through a financial institution affecting interstate or foreign commerce, with such property having been derived from such specified unlawful activity, in violation of 18 U.S.C. § 1957.

231.    As more fully described in the preceding Paragraphs, the RICO Defendants, in violation of 18 U.S.C. § 1962(c), were employed by or associated with the Enterprise, and directly and indirectly conducted, and participated in the conduct of, the affairs of the Enterprise

**CORRECTED COMPLAINT**

through a Pattern of Racketeering Activity, as more fully described in the preceding Paragraphs, and as that term is defined in 18 U.S.C. § 1961(5).

232.    As a direct and proximate result of the RICO Defendants' multiple violations of 18 U.S.C. §§ 1343, 1956(a)(1) and (a)(2), 1957, 2314, and 1961, et seq., the PilePro Plaintiffs have been substantially damaged in their business and property.

233.    As a result of the RICO Defendants' conduct, the PilePro Plaintiffs are entitled to treble damages, an award of attorney's fees, and costs of suit incurred herein.

## COUNT TWO
(Conspiracy to Violate RICO 18 U.S.C. § 1962(d))

234.    The Plaintiffs repeat and reallege by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

235.    From October 2006 through the present, the RICO Defendants and each of them willfully, knowingly, and with the intent to defraud, engaged in a Pattern of Racketeering Activity and obtained money and property from PilePro LLC, PilePro Sales, and Wendt by means of false pretenses, false representations, material omissions, and other fraudulent means.

236.    On or about the dates specifically set forth in the preceding Paragraphs of this Complaint, and on other dates in furtherance of the transactions described in the preceding Paragraphs, the RICO Defendants conspired to cause the transmission of information relating to the actions constituting part of the Pattern of Racketeering Activity by wire communication in interstate and foreign commerce for the purpose of executing, attempting to execute, and concealing the Pattern of Racketeering Activity, in violation of 18 U.S.C. § 1343.

237.    On or about the dates specifically set forth in the preceding Paragraphs of this Complaint, and on other dates in furtherance of the transactions described in the preceding

**CORRECTED COMPLAINT**

Paragraphs, the RICO Defendants conspired to travel and cause to other individuals to travel in interstate and foreign commerce for the purpose of executing, attempting to execute, and concealing the Pattern of Racketeering Activity, in violation of 18 U.S.C. § 2314.

238.   On or about the dates specifically set forth in the preceding Paragraphs of this Complaint, and on other dates in furtherance of the transactions described in the preceding Paragraphs, the RICO Defendants did knowingly and intentionally conspire to engage in, attempt to engage in, and cause others to engage in, financial transactions involving the proceeds of unlawful activity, including wire fraud and the interstate transportation of individuals, knowing that the funds involved in such financial transactions represented the proceeds of some form of unlawful activity, with the intent to promote the carrying on of the specified unlawful activity and to conceal or disguise the nature, ownership, or control of the proceeds of the unlawful activity in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and 1956(a)(2)(A) and (B)(i).

239.   On or about the dates specifically set forth in the preceding Paragraphs of this Complaint, and on other dates in furtherance of the transactions described in the preceding Paragraphs, the RICO Defendants did knowingly and intentionally conspire to engage in, attempt to engage in, and cause others to engage in monetary transactions, as that term is described in 18 U.S.C. § 1957(f)(1), in criminally derived property that was of a value greater than $10,000, including wire fraud and the interstate transportation of individuals, by or through a financial institution affecting interstate or foreign commerce, with such property having been derived from such specified unlawful activity, in violation of 18 U.S.C. § 1957.

240.   As more fully described in the preceding Paragraphs, the RICO Defendants, in violation of 18 U.S.C. § 1962(d), have conspired to (a) acquire and maintain interests in the

93

**CORRECTED COMPLAINT**

Enterprise and (b) conduct, and participate in the conduct of, the affairs of the Enterprise through a Pattern of Racketeering Activity, as that term is defined in 18 U.S.C. § 1961(5).

241.    As a direct and proximate result of the RICO Defendants' multiple violations of 18 U.S.C. §§ 1343, 1956(a)(1) and (a)(2), 1957, 2314, and 1961, et seq., the PilePro Plaintiffs have been substantially damaged in their business and property in an amount in excess of $75,000.

242.    As a result of the RICO Defendants' conduct, the PilePro Plaintiffs are entitled to treble damages, an award of attorney's fees, and the costs of suit incurred herein.

## COUNT THREE
### (Fraud)

243.    The Plaintiffs repeat and reallege by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

244.     The RICO Defendants falsely and fraudulently made the representations and the material omissions constituting the Pattern of Racketeering Activity with the intent to induce the PilePro Plaintiffs to act in the manner alleged in this Complaint and to deprive the PilePro Plaintiffs of money and property.  The false representations and material omissions include, but are not limited to, the matters set forth previously in the Pattern of Racketeering Activity.

245.    The representations and material omissions constituting the Pattern of Racketeering Activity were false, and the RICO Defendants knew that such representations were false when made.

246.    The RICO Defendants made the false representations and material omissions constituting the Pattern of Racketeering Activity with the intent to defraud and deceive the PilePro Plaintiffs.

**CORRECTED COMPLAINT**

247.    At the time the representations and material omissions constituting the Pattern of Racketeering Activity were made, and at the time the PilePro Plaintiffs took the actions alleged herein, the PilePro Plaintiffs believed the representations to be true, and did not know they were false, and did not know the truth concerning the material omissions.

248.    In reliance on the representations and the material omissions constituting the Pattern of Racketeering Activity, the PilePro Plaintiffs were induced to act as has been described in this Complaint.  Had the PilePro Plaintiffs known that the representations were false or had they known the truth concerning the material omissions, they would not have taken such actions.

249.    The PilePro Plaintiffs' reliance on the representations and material omissions constituting the Pattern of Racketeering Activity was reasonable and their actions were justified.

250.    As a proximate result of the fraud and deceit perpetrated by the RICO Defendants, the PilePro Plaintiffs have been damaged in an amount in excess of $75,000.

251.    The aforementioned acts of the RICO Defendants were willful, fraudulent, oppressive, and malicious.  The PilePro Plaintiffs are therefore entitled to an award of punitive damages in an amount in excess of $75,000.

252.    Because of the RICO Defendants' conduct, the PilePro Plaintiffs have been required to retain the services of attorneys in order to prosecute this action, and therefore, are entitled to an award of reasonable attorneys' fees and costs of suit incurred herein.

## COUNT FOUR
### (Civil Conspiracy to Defraud)

253.    The Plaintiffs repeat and reallege by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

**CORRECTED COMPLAINT**

254.    The RICO Defendants conspired together to achieve the purposes of the Enterprise through the Pattern of Racketeering Activity.  The RICO Defendants, together with the RICO Co-Conspirators, reached a meeting of the minds concerning the proposed details, objectives, and strategy of the Enterprise and the Pattern of Racketeering Activity.

255.    Each RICO Defendant acted in concert with the other RICO Defendants and RICO Co-Conspirators to devise, implement, and execute the Pattern of Racketeering Activity.

256.    Each RICO Defendant actively participated in, aided, abetted, ratified, and adopted for his or her own benefit, the actions of the other RICO Defendants and RICO Co-Conspirators in furtherance of the conspiracy and the Pattern of Racketeering Activity.

257.    As a proximate result of the conspiracy to defraud perpetrated by the RICO Defendants and RICO Co-Conspirators, the PilePro Plaintiffs have been damaged in an amount in excess of $75,000.

258.    The aforementioned acts of the RICO Defendants were willful, fraudulent, oppressive, and malicious.  The PilePro Plaintiffs are, therefore, entitled to an award of punitive damages in an amount in excess of $75,000.

259.    Because of the RICO Defendants' conduct, the PilePro Plaintiffs have been required to retain the services of attorneys in order to prosecute this action, and therefore, are entitled to an award of reasonable attorneys' fees and costs of suit incurred herein.

## COUNT FIVE
(Breach of Fiduciary Duty by Chang)

260.    The Plaintiffs repeat and reallege by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

**CORRECTED COMPLAINT**

261.    Chang was employed as CFO by both PilePro LLC and PilePro Sales. Consequently, Chang owed a duty of loyalty and honesty in all matters relating to PilePro LLC and PilePro Sales.

262.    PilePro LLC and PilePro Sales imposed its trust and confidence in Chang and consequently employed him to represent, protect, and promote their interests during the course of his employment with PilePro LLC and PilePro Sales.

263.    As a result, Chang owed a fiduciary duty to PilePro LLC and PilePro Sales.

264.    By engaging in the actions described in the preceding Paragraphs, including but not limited to the Pattern of Racketeering Activity, Chang has breached his fiduciary duties to PilePro LLC and PilePro Sales.

265.    As a proximate cause of the breaches of fiduciary duty by Chang, PilePro LLC and PilePro Sales have been damaged in an amount in excess of $75,000.

266.    Because of Chang's conduct, PilePro LLC and PilePro Sales have been required to retain the services of attorneys in order to prosecute this action, and therefore, are entitled to an award of reasonable attorneys' fees and costs of suit incurred herein.

## COUNT SIX
### (Breach of Fiduciary Duty by Heindl)

267.    The Plaintiffs repeat and reallege by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

268.    Heindl was employed by PilePro Sales as its Vice-President, Director of Global Engineering & Technology Development.  Consequently, Heindl owed a duty of loyalty and honesty in all matters relating to PilePro Sales.

**CORRECTED COMPLAINT**

269.    PilePro Sales imposed its trust and confidence in Heindl and consequently, employed him to represent, protect, and promote their interests during the course of his employment with PilePro Sales.

270.    As a result, Heindl owed a fiduciary duty to PilePro Sales.

271.    By engaging in the actions described in the preceding Paragraphs, including but not limited to the Pattern of Racketeering Activity, Heindl has breached his fiduciary duties to PilePro Sales.

272.    As a proximate cause of the breaches of fiduciary duty by Heindl, PilePro Sales has been damaged in an amount in excess of $75,000.

273.    Because of Heindl's conduct, PilePro Sales has been required to retain the services of attorneys in order to prosecute this action, and therefore, is entitled to an award of reasonable attorneys' fees and costs of suit incurred herein.

## COUNT SEVEN
### (Breach of Fiduciary Duty by Weigel)

274.    The Plaintiffs repeat and reallege by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

275.    Weigel was formerly PilePro LLC's lead patent attorney.  In this capacity, Weigel was primarily responsible for PilePro LLC's patent portfolio worldwide.  During the period of time he represented PilePro LLC, (a) Weigel advised the company concerning its patent rights and registrations in the United States, Germany, the European Union, and other jurisdictions throughout the world and (b) came into possession of privileged and confidential information and confidences of the PilePro Plaintiffs.

98

**CORRECTED COMPLAINT**

276.     At all times relevant to this Complaint, Weigel knew, and understood, that Wendt was the sole individual with final decision-making authority relating to PilePro LLC's patents and other assets.  Weigel knew, and understood, that Heindl did not have authority to act on behalf of PilePro LLC or to transfer any of its assets.

277.     Beginning in January 2008, Weigel also represented Contexo in connection with the New Connectors and other patent-related services.  At the time he began representing Contexo, Weigel knew that Contexo was affiliated with PilePro LLC, and knew that Wendt and PilePro LLC controlled Contexo. He understood that when working on Contexo-related patent matters, he was working for PilePro LLC.

278.     In connection with his services, PilePro LLC paid Weigel hundreds of thousands of dollars in legal fees.

279.     As the attorney for PilePro LLC, Weigel owed PilePro LLC a fiduciary duty. Among other things, Weigel owed PilePro LLC the highest degree of care and loyalty, including an obligation to be honest in all matters relating to his PilePro LLC.  Weigel was further obligated to place the interests of PilePro LLC above his own, to avoid any conflicts of interest, and to refrain taking a position adverse to PilePro LLC.

280.     By engaging in the actions described in the preceding Paragraphs, including but not limited to the Pattern of Racketeering Activity, Weigel breached his fiduciary duties to, and, in fact, intentionally defrauded, his former client, PilePro LLC.  Among other breaches of his fiduciary duties, Weigel

        a.     Joined the other RICO Defendants and RICO Co-Conspirators in a conspiracy to defraud PilePro LLC and steal PilePro LLC's patent rights;

99

**CORRECTED COMPLAINT**

b.      Failed to disclose that he was representing Heindl adverse to the interests of PilePro LLC;

c.      Failed to disclose that he was representing Contexo adverse to the interests of PilePro LLC;

d.      Failed to disclose that he had prepared the fraudulent Backdated Assignment and thereafter filed it with patent offices in Germany, the European Union, and other countries around the world as part of the RICO Defendants' plan to divest PilePro LLC of its patent rights unlawfully;

e.      Affirmatively misrepresented to Wendt and Williams that he would act with total loyalty and fidelity to PilePro LLC in order to continue working for PilePro LLC following Heindl's termination from PilePro Sales and Wall-Profile;

f.      Made the Weigel Conflict Representations with the knowledge that they were false and made with the intent to defraud PilePro LLC, PilePro Sales, and Wendt;

g.      Failed to disclose the Weigel Conflict Omissions with the knowledge that the information was material and with the intent to defraud PilePro LLC, PilePro Sales, and Wendt;

h.      Used the confidences and knowledge he obtained while working as PilePro LLC's patent attorney to draft claims and specifications for new patents to benefit Contexo to the detriment of PilePro LLC;

i.      Submitted to German courts affidavits and declarations containing false and fraudulent representations; and

100

j.      Appeared in legal and patent proceedings in Germany, Switzerland, and elsewhere to advocate positions adverse to PilePro LLC and in favor of the RICO Defendants, RICO Co-Conspirators, and the Enterprise.

281.    Weigel has admitted his breach of fiduciary duty and conflict of interest to a German court.  In a February 22, 2011 declaration, Weigel admitted that he became aware a conflict of interest existed between PilePro LLC and Contexo.  Weigel also informed the German court that he "resigned from representing PilePro LLC on July 4, 2010," yet, notwithstanding his admitted knowledge of the conflict, continued representing Contexo.

282.    In exchange for his breaches of fiduciary duties and fraudulent conduct, Weigel has been paid hundreds of thousands of dollars by Heindl, Farroni, and Harzenmoser through Contexo.

283.    Weigel's conduct constitutes a betrayal of his client PilePro LLC, and the PilePro group of companies.

284.    As a proximate cause of Weigel's breaches of fiduciary duty and fraudulent conduct, PilePro LLC has been damaged in an amount in excess of $75,000.

285.    Weigel's conduct, as described in the preceding Paragraphs and the Pattern of Racketeering Activity, were willful, fraudulent, oppressive, and malicious.  PilePro LLC is, therefore, entitled to an award of punitive damages in an amount in excess of $75,000.

286.    Because of Weigel's conduct, PilePro LLC has been required to retain the services of attorneys in order to prosecute this action, and therefore, is entitled to an award of reasonable attorneys' fees and costs of suit incurred herein.

**CORRECTED COMPLAINT**

## COUNT EIGHT
(Declaratory Relief)

287.    The PilePro Plaintiffs repeat and reallege by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

288.    An actual controversy now exists between PilePro LLC, PilePro Inc, and Wendt, on the one hand, and the RICO Defendants, on the other hand, concerning Heindl's authority to assign or transfer PilePro LLC's Non-US Patent Rights to Contexo.

289.    Pursuant to 28 U.S.C. § 2201 and V.T.C.A., Civil Practice & Remedies Code § 37.001 *et seq.*, PilePro LLC and PilePro Inc are entitled to a declaration that, among other things, (a) Heindl was not a stockholder or officer in PilePro Inc; (b) Heindl was not the CEO of PilePro LLC; (c) Heindl did not have authority to transfer or assign the Non-US Patent Rights to Contexo in the Backdated Assignment or any other document; (d) Wendt is a stockholder in Contexo; and (e) the Backdated Assignment is void and of no force or effect.

290.    Pursuant to 28 U.S.C. § 2202, PilePro LLC, PilePro Inc, and Wendt are entitled to further relief compelling the RICO Defendants to comply with the aforementioned declarations.

## COUNT NINE
(Intentional Interference with Contractual Relations)

291.    The PilePro Plaintiffs repeat and reallege by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

292.    On January 25, 2011, PilePro Sales entered into a written contract with METO, a Russian corporation, under which METO agreed to purchase Modular Connectors from PilePro Sales to resell in Russia ("METO Contract").

**CORRECTED COMPLAINT**

293.   The RICO Defendants and Co-Conspirators, including Chang and Heindl, were aware of the METO Contract and its terms and conditions.  They, therefore, knew that METO had agreed to buy Modular Connectors PilePro Sales.

294.   Chang, Heindl, and Steelwall, together with, and for the benefit of the other RICO Defendants and RICO Co-Conspirators, knowingly, intentionally, and willfully induced METO to breach the METO Contract by purchasing Modular Connectors from Steelwall GmbH.

295.   As a proximate result of the conduct of Chang, Heindl, and Steelwall GmbH, METO breached the METO Contract and has purchased Modular Connectors from Steelwall GmbH instead of PilePro Sales ("METO Interference").

296.   As a result of the conduct of Chang, Heindl, Steelwall GmbH, and the other RICO Defendants and RICO Co-Conspirators, PilePro Sales has been damaged in an amount greater than $75,000.

297.   Because of the conduct of Chang, Heindl, Steelwall, GmbH, and the other RICO Defendants and RICO Co-Conspirators, PilePro Sales has been required to retain the services of attorneys in order to prosecute this action, and therefore, is entitled to an award of reasonable attorneys' fees and costs of suit incurred herein.

## COUNT TEN
### (Intentional Interference with Prospective Economic Advantage)

298.   The PilePro Plaintiffs repeat and reallege by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

299.   There existed a reasonable probability that PilePro Sales would enter into agreements to sell large quantities of Modular Connectors and WADIT to METO ("METO Opportunity") and to JD Fields during 2011 ("JD Fields Opportunity").

103

**CORRECTED COMPLAINT**

300.    There also existed a reasonable probability that PilePro Steel would enter into contractual agreements to sell large quantities of Modular Connectors and WADIT to Rautaruukki Plc, a Finish company ("Ruuki") ("Ruuki Opportunity").

301.    Chang, Heindl, and the other RICO Defendants and RICO Co-Conspirators were aware of, and knew about, the METO, JD Fields, and Ruuki Opportunities, and knew that Pile Pro Sales and PilePro Steel had a reasonable probability of entering into contractual relationships with METO, JD Fields, and Ruuki.

302.    Chang, Heindl, and Steelwall, together with, and for the benefit of the RICO Defendants and RICO Co-Conspirators, intentionally, wrongfully, and tortiously interfered with the METO Opportunity, the JD Fields Opportunity, and the Ruuki Opportunity and induced METO, JD Fields, and Ruuki to purchase Modular Connectors from Steelwall GmbH instead of PilePro Sales or PilePro Steel ("Steelwall Interferences").

303.    As a proximate result of the conduct of Chang, Heindl, and Steelwall GmbH, and the other RICO Defendants and RICO Co-Conspirators, METO, JD Fields, and Ruuki stopped purchasing Modular Connectors from PilePro Sales or PilePro Steel, and instead purchased Modular Connectors from Steelwall GmbH.

304.    As a result of the conduct of Chang, Heindl, Steelwall GmbH, and the other RICO Defendants and RICO Co-Conspirators, PilePro Sales has been damaged in an amount greater than $75,000.

305.    Because of the conduct of Chang, Heindl, Steelwall, GmbH, and the other RICO Defendants and RICO Co-Conspirators, PilePro Sales has been required to retain the services of attorneys in order to prosecute this action, and therefore, is entitled to an award of reasonable attorneys' fees and costs of suit incurred herein.

104

**CORRECTED COMPLAINT**

## COUNT ELEVEN
(Fraud – Heindl)

306.    The PilePro Plaintiffs repeat and reallege by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

307.    In connection with his relocation from Germany to Austin, Texas, Heindl desired to educate his children at an expensive private boarding school located in New Hampshire. Claiming he did not personally have sufficient funds to pay for the private school tuition, Heindl asked Wendt to loan him the sum of $101,043.01 in or around September 20, 2009 ("School Loan").  At the time he asked Wendt for the loan, Heindl represented to Wendt that he would repay the School Loan.

308.    In September, 2009, Heindl asked Wendt to loan him $7,000 personally.  Heindl represented that the loan was for the benefit of his brother, Robert Heindl ("Brother Loan").  At the time he asked Wendt for the loan, Heindl represented to Wendt that he would repay the Brother Loan.

309.    Heindl's representations that he would repay the School Loan and the Brother Loan were false, and Heindl knew that his representations were false when he made them.

310.    Heindl made the School Loan and Brother Loan misrepresentations with the intent to defraud and deceive Wendt.

311.    In reliance on Heindl's representations and promises to repay the School Loan, Wendt paid the sum of $101,043.01 to Tilton School in New Hampshire on September 21, 2009. Because Wendt paid Tilton, Heindl's children were permitted to attend the private boarding school.

**CORRECTED COMPLAINT**

312.    In reliance on Heindl's representations and promises to repay the Brother Loan, Wendt loaned Heindl the sum of $7,000 on September 29, 2009.

313.    At the time Wendt made the School Loan and the Brother Loan, he believed Heindl's representations to be true, and did not know they were false.  Had Wendt known that the representations were false, he would not have extended the School Loan or the Brother Loan.

314.    Wendt reasonably relied on the Heindl's representations concerning the School Loan and the Brother Loan.  Accordingly, Wendt's actions were justified.

315.    As a proximate result of the fraud and deceit perpetrated by Heindl, Wendt has been damaged in an amount in excess of $75,000.

316.    Heindl's aforementioned acts were willful, fraudulent, oppressive, and malicious. Therefore, Wendt is entitled to an award of punitive damages in an amount in excess of $75,000.

317.    Because of Heindl's conduct, Wendt has been required to retain the services of attorneys in order to prosecute this action, and therefore, is entitled to an award of reasonable attorneys' fees and costs of suit incurred herein.

## COUNT TWELVE
### (Unjust Enrichment)

318.    The PilePro Plaintiffs repeat and reallege by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

319.    As a result of the RICO Defendants' conduct, they have obtained the use and benefits of the Non-US Patent Rights, the New Connector Patent Rights, and other property acquired as a result of their Pattern of Racketeering Activity, the School Loan and Brother Loan frauds, and the METO Interference and Steelwall Interferences.  The RICO Defendants were not entitled to the use and benefit of the Non-US Patent Rights, the New Connector Patent Rights,

**CORRECTED COMPLAINT**

and the money and other property acquired as a result of their Pattern of Racketeering Activity, the School Loan and Brother Loan frauds, and the METO Interference and the Steelwall Interferences.

320.    Despite their knowledge that they were not entitled to such benefits and uses, the RICO Defendants have failed and refused to return the property to the PilePro Plaintiffs or to compensate them for all losses incurred as a result of their conduct.

321.    Unless the RICO Defendants either return the Non-US Patent Rights, the New Connector Patent Rights, and the money and other property acquired as a result of their Pattern of Racketeering Activity, the School Loan and Brother Loan frauds, and the METO Interference and the Steelwall Interferences, the RICO Defendants will be unjustly enriched to the detriment of the PilePro Plaintiffs.

322.    Because of the RICO Defendants' conduct, the PilePro Plaintiffs have been required to retain the services of attorneys in order to prosecute this action, and therefore, are entitled to an award of reasonable attorneys' fees and costs of suit incurred herein.

## COUNT THIRTEEN
(Constructive Trust)

323.    The PilePro Plaintiffs repeat and reallege by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

324.    By reason of the RICO Defendants' fraudulent and wrongful conduct, as described in this Complaint, and to prevent them from being unjustly enriched thereby, a constructive trust arose in favor of the PilePro Plaintiffs with respect to all proceeds arising from the Pattern of Racketeering Activity, the School and Brother Loan frauds, and the METO, JD Fields, and Ruuki Interferences, and breaches of fiduciary duties.

**CORRECTED COMPLAINT**

325.    The RICO Defendants have a duty to (a) transfer and deliver to the PilePro Plaintiffs all of their interests in the proceeds of the Pattern of Racketeering Activity, the School and Brother Loan frauds, and the METO Interference and the Steelwall Interferences, and breaches of fiduciary duty and (ii) account to the PilePro Plaintiffs for the fair value of the proceeds, together with all income relating thereto.

326.    The PilePro Plaintiffs have no adequate remedy at law.

327.    Because of the RICO Defendants' conduct, the PilePro Plaintiffs have been required to retain the services of attorneys in order to prosecute this action, and therefore, are entitled to an award of reasonable attorneys' fees and costs of suit incurred herein.

## COUNT FOURTEEN
(Breach of Employment Contract — Heindl)

328.    The PilePro Plaintiffs repeat and reallege by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

329.    On or about May 22, 2009, Heindl entered into a written employment agreement with PilePro Sales ("Heindl Employment Agreement").  According to its terms, the Heindl Employment Agreement became effective on June 1, 2009.

330.    In his capacity as CFO of PilePro Sales, Chang was responsible for negotiating the terms of the Heindl Employment Agreement, overseeing the drafting of the Agreement, and ensuring the Agreement was executed by Heindl.

331.    Heindl entered into the Heindl Employment Agreement in connection with his application for a work visa from the United States Department of Homeland Security.  From approximately August 2009 through April 21, 2010, Heindl worked for PilePro Sales in Austin,

**CORRECTED COMPLAINT**

Texas.  Throughout the time he was employed by PilePro Sales, Heindl worked under, and was paid under, the terms of the Heindl Employment Agreement.

332.    Paragraph 3 of the Heindl Employment Agreement provides in pertinent part:

Employee agrees not to provide materially similar services to potential or actual competitors in the company's market areas, defined as North America (NAFTA zone of US, Canada & Mexico) and the European Union for a period of 36 months after termination of employment.

("Heindl Non-Compete Provision").

333.    In addition, Paragraph 4 of the Heindl Employment Agreement states in pertinent part:

In the course of performing work for the company, the parties recognize that employee may come in contact or become familiar with information, which the Company or its subsidiaries or affiliates may consider confidential. . . . Employee agrees to keep all such information confidential and not to discuss or divulge it to anyone other than appropriate Company personnel or their designees.

Employee agrees to maintain said confidentiality for a period of 36 months after separation of services.

("Heindl Trade Secret Provision").

334.    While he was employed by PilePro Sales, Heindl became familiar with, and formed relationships with, PilePro Sales' suppliers, vendors, customers, and prospective customers.

335.    Heindl further became familiar with PilePro Sales' trade secrets, proprietary, and other confidential information not generally known to the public regarding its Modular Connectors and sealants; business methods; and financial, marketing, and contractual information relating to its business practices and operations.

336.    On or about April 21, 2010, Heindl was terminated as an employee of PilePro Sales.

**CORRECTED COMPLAINT**

337.    On or about August 2, 2010, the RICO Defendants and RICO Co-Conspirators formed, or caused to be formed, Steelwall GmbH.  Heindl is an owner of, or otherwise affiliated with, Steelwall GmbH.

338.    Chang and Heindl direct the activities of Steelwall GmbH.

339.    Steelwall GmbH is a direct competitor of PilePro Sales.  Among other things, Steelwall GmbH sells, and is attempting to sell, Modular Connectors and sealants in the United States and in the United States, Canada, Mexico, and the European Union, countries subject to the Heindl Non-Compete Provision.

340.    Through Chang and Heindl's personal knowledge, Steelwall GmbH was aware of the Heindl Employment Agreement, and all of the obligations contained therein, when it began business operations.

341.    Contrary to the terms of the Heindl Non-Compete Provision, Heindl is competing with PilePro Sales through Steelwall GmbH, and perhaps other entities in the United States, Canada, and the European Union.

342.    Contrary to the terms of the Heindl Trade Secret Provision, Heindl has used, disclosed, or discussed, and will continue to use, disclose, and discuss, PilePro Sales confidential information and trade secrets.

343.    Heindl has breached, and continues to breach, the Heindl Employment Agreement by (a) forming Steelwall GmbH to compete with PilePro Sales in the United States and other countries around the world; (b) actively and openly competing against PilePro Sales in the United States, Canada, Mexico, and the European Union; and (c) using and disclosing PilePro Sales' confidential and proprietary information.

344.    Heindl has engaged in this conduct without the consent of PilePro Sales.

**CORRECTED COMPLAINT**

345. Heindl's conduct constitutes a breach of the Heindl Employment Agreement.

346. PilePro Sales has performed all of its obligations under the Heindl Employment Agreement.

347. As a direct and proximate cause of Heindl's breach, PilePro Sales has been damaged in an amount exceeding $75,000.

348. Because of Heindl's conduct, PilePro Sales has been required to retain the services of attorneys in order to prosecute this action, and therefore, is entitled to an award of reasonable attorneys' fees and costs of suit incurred herein.

**COUNT FIFTEEEN**
(Intentional Interference with Contractual Relations – Chang and Steelwall GmbH)

349. The PilePro Plaintiffs repeat and reallege by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

350. Heindl entered into the Heindl Employment Agreement with PilePro Sales.

351. Chang and Steelwall GmbH had knowledge of Heindl's contractual obligations to PilePro Sales.

352. Chang and Steelwall GmbH knowingly, willfully, and intentionally interfered with the Heindl Employment Agreement by:

      a.    Inducing Heindl to breach the Heindl Employment Agreement;

      b.    Inducing Heindl to use and/or disclose PilePro Sales' trade secrets, proprietary, and confidential information.

353. The interference by Steelwall GmbH and Chang was neither privileged nor justified.

**CORRECTED COMPLAINT**

354.    The conduct of Steelwall GmbH and Chang has caused actual harm to PilePro Sales in an amount in exceeding $75,000.

355.    The conduct of Steelwall GmbH and Chang has been malicious, oppressive, and fraudulent.  They have acted without regard for the rights of PilePro Sales.  Accordingly, PilePro Sales is entitled to an award of punitive damages in an amount exceeding $75,000.

356.    Because of the conduct of Steelwall GmbH and Chang, PilePro Sales has been required to retain the services of attorneys in order to prosecute this action, and therefore, are entitled to an award of reasonable attorneys' fees and costs of suit incurred herein.

## JURY DEMAND

357.    Plaintiffs request that all triable issues be determined by a jury.

## PRAYER

WHEREFORE, the PilePro Plaintiffs ask this Court to enter Judgment against the RICO Defendants, and each of them, as follows:

1.    For treble the actual damages, which damages are for an amount in excess of $75,000, arising from Counts I and II;

2.    For compensatory damages arising from the remaining Counts in an amount exceeding $75,000;

3.    For an award of punitive damages arising from the remaining Counts in an amount exceeding $75,000;

4.    For an Order requiring the RICO Defendants to divest themselves of any interest in the Enterprise, including Contexo and Steelwall GmbH and prohibiting them from engaging in the Domestic and International Connector Markets;

**CORRECTED COMPLAINT**

5.      For the imposition of a constructive trust on all proceeds from the Pattern of Racketeering Activity, including any and all patent rights held by Contexo, Heindl, or any of the RICO Defendants, RICO Co-Conspirators, or individuals and entities affiliated with them, together with any proceeds derived from the School Loan and Brother Loan;

6.      For an Order declaring that (a) Heindl is not, and has never been, a stockholder or officer in PilePro Inc; (b) Heindl is not, and has never been, the CEO of PilePro LLC; (c) Heindl did not have, and has never had, authority to transfer or assign the patent rights owned by PilePro LLC to Contexo in the Backdated Assignment or any other document; (d) Wendt is a stockholder in Contexo; and (e) the Backdated Assignment is void and of no force or effect;

7.      For disgorgement of all attorneys' fees and expenses paid by the PilePro Plaintiffs to RICO Defendant Weigel;

8.      For an award of reasonable attorneys' fees and costs of suit incurred herein; and

9.      For such other and further relief as the Court may deem appropriate under the circumstances.

**CORRECTED COMPLAINT**

Respectfully submitted,


*/s/ Leslie C. Thorne*
Barry F. McNeil
Texas State Bar No. 13829500
HAYNES AND BOONE, L.L.P.
2323 Victory Avenue
Suite 700
Dallas, Texas 75219
214.651.5000  Telephone
214.651.5940  Facsimile


Leslie C. Thorne
Texas State Bar No. 24046974
HAYNES AND BOONE, L.L.P.
600 Congress Avenue
Suite 1300
Austin, Texas 78701
512.867.8400  Telephone
512.867.8470  Facsimile


Douglass Allyn Mitchell
Admitted Pro Hac Vice
BOIES, SCHILLER & FLEXNER
300 South Fourth Street, Suite 800
Las Vegas NV  89101
(702) 382-7300 Telephone
(702) 382-2755 Facsimile


Lee S. Wolosky
Admitted Pro Hac Vice
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, Seventh Floor
New York NY  10002
(212) 446-2300 Telephone
(212) 446-2350 Facsimile


ATTORNEYS FOR PLAINTIFF

**CORRECTED COMPLAINT**